# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| HILARIO MONTES JR., NICOLAS DELGADO, URIEL DELGADO, AND BLANCA DELGADO,<br><br>    PLAINTIFFS,<br><br>    V.<br><br>LOUIS GERARDO CARDENAS, EDER CIFUENTES, DAVID HERRERA, DENISSE ZUNIGA, SUPERMERCADO TALPA, INC., SUPERMERCADO TALPA #2, INC., SUPERMERCADO TALPA # 3 INC., SUPERMERCADO TALPA #5, INC., SUPERMERCADO TALPA #6, INC., SUPERMERCADO TALPA #7, INC., SUPERMERCADO TALPA #8, INC., SUPERMERCADO TALPA 9, INC., SUPERMERCADO TALPA 10, LLC, SUPERMERCADO TALPA 11, LLC, SUPERMERCADO TALPA 12, LLC, ENLI PROPERTY, LLC, N&G MANAGEMENT, LLC, LIMA CHARLIE, LLC, PLAZA TALPA NASHVILLE, LLC, PLAZA TALPA FOREST PARK, LLC, PLAZA TALPA, LLC, PLAZA TALPA SUGARLOAF, LLC, E.L. SUPERMARKET DISTRIBUTORS, INC., LUJO EQUIPMENT INC., SERVICE MEAT DISTRIBUTORS, LLC, TALPA GROUP HOLDINGS, INC., TALPAS GROUP, LLC, TAQUERIA TALPA, LLC, GA STAFFING | JURY TRIAL DEMANDED<br><br><br>CIVIL ACTION FILE NO.:<br><br>_____ |

SOLUTIONS, INC., DAC SOLUTIONS,
INC., ERC SOLUTIONS, INC., GA
GROUP SOLUTIONS, INC., LVC
SOLUTIONS, INC., MABLETON GROUP
SOLUTIONS, INC., RCL SOLUTIONS
INC., USA SOLUTIONS, INC., VC
SOLUTIONS, INC., TN GROUP
SOLUTIONS, INC., and NASHVILLE
GROUP SOLUTIONS, INC.,

    DEFENDANTS.

## <u>COMPLAINT</u>

COME NOW Plaintiffs Hilario Montes Jr. ("**Plaintiff Hilario**"), Nicolas Delgado ("**Plaintiff Nicolas**"), Uriel Delgado ("**Plaintiff Uriel**"), and Blanca Delgado ("**Plaintiff Blanca**, and collectively with Plaintiff Nicolas and Plaintiff Uriel, the "**Delgado Plaintiffs**," and collectively with Plaintiff Hilario, the "**Plaintiffs**"), pursuant to Fed. R. Civ. P. 8 (a) & (d), and file this action against the Defendants, respectfully showing the Court as follows:

### INTRODUCTION

1.    This case revolves around the actions of Defendant Louis "Gerardo" Cardenas and his close associates, who have conspired for years in a pattern of racketeering, embezzlement, theft, fraud, and numerous breaches of their

duties as persons in control of a network of Latin grocery stores, and related entities, operating under the "Talpa Supermercados" brand.[1]

2.    The Plaintiffs were early investors in some of the first Talpa Supermercados approximately ten years ago, and their funds and efforts were critical to building the Talpa Supermercados stores, brand, and profitability into what they are today.

3.    Since the beginning, Gerardo Cardenas repeatedly lied to the Plaintiffs about their investments and concealed as much information as possible so that the Plaintiffs would be unaware of the extent of the defendants' unlawful activity. For years, Defendants concealed the extent to which they had stolen the Plaintiffs' money, defrauded them, and otherwise flouted their legal rights.[2]

4.    Over the years, Gerardo began to increasingly involve the other individual defendants in his schemes. These Defendants—as key persons in control of the Talpa enterprise—willingly participated.

---

[1]    Although he holds himself out to the public as "Louis" Cardenas, he is and has always been known in the Mexican community as "Gerardo."

[2]    Although he holds himself out to the public as "Louis" Cardenas, he is and has always been known in the Mexican community as "Gerardo."

5.    Driven by greed, the goal of Gerardo and his co-defendants has always been to retain as much of the Talpa enterprise profits for themselves, regardless of the Plaintiffs' rights.

6.    In recent years, Defendant Gerardo and his co-defendants have begun to systematically "push out" owners, store managers, and investors who are not privy to their conspiracy from the Talpa enterprise in an effort to conceal the theft and fraud that has occurred over the years.

7.    Earlier this year, Plaintiffs realized they were being lied to and began to ask basic questions about why they had not received profit distributions to which they were entitled. In response, Defendant Gerardo quickly made "take it or leave it" offers to the Plaintiffs to try to buy their equity and push them out of the Talpa enterprise. Defendant Gerardo and his associates began putting extreme pressure on Plaintiffs to accept these ultimatums before they could discover the extent of the conspiratorial fraud and theft.

8.    When Plaintiffs dared to ask Defendants for basic due diligence information to evaluate their offers, Defendants refused and conspired to "freeze out" the Plaintiffs, cutting off monthly distributions that Plaintiffs Hilario Montes and Nicolas Delgado had received for years, baselessly terminating Plaintiff Hilario's employment, and rescinding both buyout offers.

9.  With knowledge that Plaintiff Nicolas is disabled and that Plaintiff Hilario is unemployed, Defendant Gerardo's goal in freezing out the Plaintiffs was to try to "starve them out" and to prevent them from affording legal representation to enforce their rights. Unfortunately, by proceeding in bad faith, the Defendants left the Plaintiffs no choice but to file this lawsuit.

10. In sum, the Defendants have systematically used the Plaintiffs' resources to build an empire and now are attempting to use money and power against the Plaintiffs to crush them, with the explicit (and admitted) goal of depriving the Plaintiffs of their rights.

## PARTIES, JURISDICTION, AND VENUE

### The Plaintiffs

11. Plaintiff Hilario is a resident of Gwinnett County, Georgia. Plaintiff Hilario is a shareholder of Supermercado Talpa #2, Inc., Supermercado Talpa # 5, Inc., and Supermercado Talpa #7, Inc. at all times relevant to this action. Plaintiff Hilario is and has remained the sole shareholder of HJRM Trucking, Inc. at all times relevant to this action.

12. Plaintiff Nicolas is a resident of DeKalb County, Georgia. Plaintiff Nicolas is a shareholder of Supermercado Talpa #3, Inc. and Supermercado Talpa #5,

Inc., and has been a member of N&G Management, LLC at all times relevant to this action.

13.   Plaintiff Uriel is a resident of DeKalb County, Georgia. Plaintiff Uriel has been a member of N&G Management, LLC at all times relevant to this action.

14.   Plaintiff Blanca is a resident of DeKalb County, Georgia. Plaintiff Blanca has been a member of N&G Management, LLC at all times relevant to this action.

## The Individual Defendants

15.   Defendant Louis Gerardo Cardenas ("**Defendant Gerardo**") is a resident of Gwinnett County, Georgia. Defendant Gerardo is the Chief Executive Officer ("**CEO**") of the Talpa enterprise. Defendant Gerardo is currently registered as, *inter alia*, CEO of Talpa #2, Talpa #3, Talpa #5, and Talpa #7, and other relevant defendant entities, and is subject to the jurisdiction of this Court. Defendant Gerardo may be served at 2411 Lockerly Pass, Duluth, Georgia 30097.

16.   Defendant Eder Cifuentes ("**Defendant Eder**") is a resident of Barrow County, Georgia. Defendant Eder is the current Chief Financial Officer ("**CFO**") of the Talpa enterprise. Defendant Eder is currently registered as, *inter alia*, CFO of Talpa #2, Talpa #3, Talpa #5, and Talpa #7, and is subject

to the jurisdiction of this Court. Defendant Eder may be served at 2625 Gate Park Drive, Bethlehem, GA 30620.

17.     Defendant David Herrera ("**Defendant David**") is a resident of Gwinnett County, Georgia. Defendant David is the current Vice President of the Talpa enterprise. Defendant David is registered as, *inter alia*, Secretary of SUPERMERCADO TALPA, INC. and E.L. SUPERMARKET DISTRIBUTORS, INC., and is subject to the jurisdiction of this Court. Defendant David may be served at 76 Morning Top Court, Suwanee, Georgia 30024.

18.     Defendant Denisse Zuniga ("**Defendant Denisse**") is a resident of Gwinnett County, Georgia. Defendant Denisse is the registered Secretary of Talpa #2, Talpa #3, Talpa #7, Talpa #8, and other relevant defendant entities, and is subject to the jurisdiction of this Court. Defendant Denisse may be served at 3502 Tree View Drive, Snellville, Georgia 30078.

19.     Defendant Gerardo, Defendant Eder, Defendant David, and Defendant Denisse are hereinafter collectively referred to as the "**Individual Defendants.**"

## **The Operating Entities**

20.    SUPERMERCADO TALPA, INC. ("**Talpa #1**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

21.    SUPERMERCADO TALPA #2, INC. ("**Talpa #2**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

22.    SUPERMERCADO TALPA #3 INC. ("**Talpa #3**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

23.    SUPERMERCADO TALPA #5, INC. ("**Talpa #5**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.[3]

---

[3]    The store that would have been known as Talpa #4 was to be run by Defendant Gerardo's brother and was not profitable. The store was ultimately sold. Accordingly, there is no Talpa #4. Also, Talpa #6 in Gainesville, Georgia closed on September 16, 2022. Accordingly, although numbered up through 12, the Plaintiffs believe there are currently 10 stores currently operating.

24.    SUPERMERCADO TALPA #6, INC. ("**Talpa #6**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

25.    SUPERMERCADO TALPA #7, INC. ("**Talpa #7**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

26.    SUPERMERCADO TALPA #8, INC. ("**Talpa #8**") is a Georgia corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

27.    SUPERMERCADO TALPA 9, INC. ("**Talpa #9**") is a Tennessee corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 5127 Nolensville Rd., Nashville, TN 37211.

28.    SUPERMERCADO TALPA 10, LLC ("**Talpa #10**") is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be

served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

29. SUPERMERCADO TALPA 11, LLC ("**Talpa #11**") is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

30. SUPERMERCADO TALPA 12, LLC ("**Talpa #12**") is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Drive, Stone Mountain, GA 30083.

31. Talpa #1, Talpa #2, Talpa #3, Talpa #5, Talpa #6, Talpa #7, Talpa #8, Talpa #9, Talpa #10, Talpa #11, and Talpa #12 are hereinafter collectively referred to as the "**Operating Entities.**"

## The Holding Entities

32. ENLI PROPERTY, LLC is a Georgia liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

33.    N&G MANAGEMENT, LLC is a Georgia liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

34.    LIMA CHARLIE, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

35.    PLAZA TALPA NASHVILLE, LLC is a Tennessee limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 5127 Nolensville Rd, Nashville, TN 37211.

36.    PLAZA TALPA FOREST PARK, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

37.    PLAZA TALPA, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

38.   PLAZA TALPA SUGARLOAF, LLC is a Georgia liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

39.   The entities described in Paragraphs 32 through 38 are hereinafter collectively referred to as the "**Holding Entities**."

## The Other Entities

40.   E.L. SUPERMARKET DISTRIBUTORS, INC. is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

41.   LUJO EQUIPMENT INC. is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

42.   SERVICE MEAT DISTRIBUTORS, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

43.   TALPA GROUP HOLDINGS, INC. is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1896 Graves Road, Norcross, GA 30093.

44.   TALPAS GROUP, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1564 McCurdy Dr, Stone Mountain, GA 30083.

45.   TAQUERIA TALPA, LLC is a Georgia limited liability company and is subject to the jurisdiction of this Court and may be served via its registered agent Louis G. Cardenas at 1896 Graves Rd, Norcross, GA 30093.

46.   The entities described in Paragraphs 40 through 45 are hereinafter collectively referred to as the "**Other Entities**."

### The Staffing Companies

47.   GA STAFFING SOLUTIONS, INC., formerly known as D. C. SOLUTIONS, INC., is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy. 29, Tucker, GA 30084.

48.   DAC SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy 29, Tucker, GA 30084.

49.   ERC SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy 29, Tucker, GA 30084.

50.   GA GROUP SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Lawrenceville Hwy, Tucker, GA 30084.

51.   LVC SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy 29, Tucker, GA 30084.

52.   MABLETON GROUP SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Lawrenceville Hwy., Tucker, GA 30084.

53.   RCL SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy 29, Tucker, GA 30084.

54.   USA SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Lawrenceville Hwy., Tucker, GA 30084.

55. VC SOLUTIONS, INC.is a Georgia profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5705 Hwy 29, Tucker, GA 30084.

56. TN GROUP SOLUTIONS, INC. is a Tennessee profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5127 Nolensville Pike, Nashville, TN 37211.

57. NASHVILLE GROUP SOLUTIONS, INC. is a Tennessee profit corporation and is subject to the jurisdiction of this Court and may be served via its registered agent Denisse Zuniga at 5127 Nolensville Pike, Nashville, TN 37211.

58. The entities described in Paragraphs 47 through 57 are hereinafter collectively referred to as the "**Staffing Companies**."

## Jurisdiction and Venue

59. This Court has original subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 (a) and 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

60. Pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia, because all Defendants except for Talpa #9 are subject to personal jurisdiction and reside in this judicial district.. Talpa #9 is

subject to the personal jurisdiction and venue of this Court pursuant to 18 U.S.C. § 1965(b) and O.C.G.A. § 9-10-91.

61.    Jurisdiction and venue are otherwise proper in this Court.

### FACTS RELEVANT TO ALL COUNTS

### The Talpa Enterprise

62.    The Individual Defendants, Operating Entities, Holding Entities, Other Entities, and Staffing Companies participated in a pattern of racketeering through a large-scale enterprise consisting of the four named individuals and others, at least ten grocery stores, and various other related entities that operate in several states, including Georgia and Tennessee, under and for the benefit of the "Talpa Supermercados" brand (collectively, the "**Talpa Enterprise**").

63.    The Talpa Enterprise is very profitable, with tens of millions of dollars in annual revenue and millions of dollars in annual profits.

64.    The Talpa Enterprise buys and sells goods and services across state and national boundaries for the benefit of the Individual Defendants, the Operating Entities, the Holding Entities, the Other Entities, and the Staffing Companies.

65.    The Talpa Enterprise buys and sells goods and services from suppliers within and outside the states of Georgia and Tennessee to consumers in both states.

66. The Talpa Enterprise purchases goods from foreign suppliers and sells those goods in the continental United States, specifically the states of Georgia and Tennessee, though other states are also implicated through supply chain sources.

67. The Talpa Enterprise's retail grocery stores are operated by the Operating Entities.

68. Some of the stores are housed in buildings owned by third-party landlords, and others are housed in buildings owned by affiliated persons and/or entities, including without limitation the Holding Entities.

69. The Talpa Enterprise includes several other affiliated entities that provide it various services, including without limitation the Other Entities, which provide services such as meat distribution, bakery services, restaurant services, equipment rental, and more.

70. Instead of paying payroll, benefits, and related obligations directly, the Operating Entities, Holding Entities, and Other Entities use a multitude of affiliated staffing companies to shield themselves from labor laws and tax obligations, including without limitation, the Staffing Companies.

71. Without limitation, the Operating Entities, the Holding Entities, the Staffing Companies, and the Other Talpa Entities comprise the Talpa Enterprise (each

a "**Talpa Entity**" and collectively the "**Talpa Entities**"). There are likely additional entities beyond those listed above, but due to the Defendants' refusal to produce information, the Plaintiffs are unaware of the full extent of the Talpa Enterprise or the interests of various owners therein.

72. The Individual Defendants are the key decision-makers and the "brain trust" of the Talpa Enterprise.

73. Defendant Gerardo is the founder and CEO of the Talpa Enterprise and is central to its growth and expansion efforts.

74. Upon information and belief, Defendant Gerardo is a shareholder or member of each of the Talpa Entities and is the majority shareholder in many of them.

75. Defendant Eder is the Chief Financial Officer of the Talpa Enterprise and is central to managing its finances.

76. Upon information and belief, Defendant Eder is a shareholder or member of several of the Talpa Entities.

77. Defendant David is the Chief Operating Officer of the Talpa Enterprise and is central to managing store operations.

78. Upon information and belief, Defendant David is a shareholder or member of several of the Talpa Entities.

79.    Defendant Denisse is the Corporate Secretary of the Talpa Enterprise and was central to overseeing legal documentation, accounting, and human resources functions until sometime in 2021, at which time her role was changed to management of the Staffing Companies.

80.    Plaintiff Nicolas and Plaintiff Hilario were early investors in the Talpa Enterprise and without their investments and efforts, the Talpa Enterprise could not have grown into what it is today.

### The Humble Beginnings

81.    Plaintiff Nicolas moved to the United States in 1983 to pursue the American dream. Plaintiff Nicolas worked incredibly hard throughout his life in the construction industry—at times working 19–20 hours per day. Through his labor, Plaintiff Nicolas was able to save money. Plaintiff Nicolas for over two decades worked around the country, sacrificing time with his children, to collect the funds needed to invest in the Talpa Enterprise.

82.    Plaintiff Nicolas has known Defendant Gerardo since Defendant Gerardo was twelve years old, for nearly 25 years. The families of Plaintiff Nicolas and Defendant Gerardo lived near each other in Rome, Georgia for many years and became very close.

83. Circa 1998, Defendant Gerardo's family opened the first of two small grocery stores in Rome, Georgia (under the "Celia's" brand) both of which were sold around 2009, when the family moved to Atlanta, Georgia.

84. Circa 2009, Defendant Gerardo's family opened the first Celia's store in the Atlanta area, on Jimmy Carter Boulevard. That store would later be re-branded as a Talpa store (Talpa #1).

85. Shortly after moving to Atlanta, on January 9, 2010, Defendant Gerardo' father was killed.

86. After the passing of Defendant Gerardo's father, the relationship between Plaintiff Nicolas and Defendant Gerardo strengthened. Plaintiff Nicolas has– since that time and until Defendant Gerardo's outrageous actions recently came to light – considered Defendant Gerardo to be part of his family and has treated him like a son.

87. On October 26, 2010, the Celia's store on Jimmy Carter Boulevard was re-branded to "Talpa" and would become known as Talpa #1.

88. Talpa #1 was not particularly profitable but managed to survive.

### Plaintiff Hilario Joins Talpa

89.   Defendant Gerardo had big plans for Talpa after rebranding it from Celia's, but he did not have the capital or creditworthiness necessary for his grandiose plans.

90.   Circa 2011, Defendant Gerardo sought out people who could help him expand the Talpa operations.

91.   Plaintiff Hilario was born in Chicago, Illinois but eventually made his way to Georgia in or about 2003.

92.   Plaintiff Hilario worked for a Talpa competitor (Jalisco) since coming to Georgia; he worked his way up from a produce employee to the store manager. Plaintiff Hilario had been in this role for approximately three years when he was solicited to work for Talpa.

93.   In late 2011, when Defendant Eder was working at a bakery owned by Defendant Gerardo, Defendant Eder approached Plaintiff Hilario to work for Talpa #1.

94.   Plaintiff Hilario did not want to leave Jalisco because, as store manager, he was doing well there, but Defendant Gerardo was persistent and promised Plaintiff Hilario ownership in Talpa to induce him to leave Jalisco.

95.   Excited about the ownership opportunity, Plaintiff Hilario eventually agreed to work with Defendant Gerardo. On or about December 4, 2011, Plaintiff Hilario began work for Talpa #1.

96.   Plaintiff Hilario was a key member of the Talpa Enterprise in its early years and instrumental to its success because of his experience and skills in managing a grocery store.

## Plaintiff Hilario's Sweat Equity

97.   Because money was tight, Plaintiff Hilario was only paid $500 per week for his services to Talpa #1.

98.   In early 2012, Defendant Gerardo approached Plaintiff Hilario and offered to make him a manager in a soon-to-open second Talpa store because Defendant Gerardo said he "did not have the patience" to manage the employees.

99.   Plaintiff Hilario worked with Defendant Gerardo and his family to open the second Talpa store (the "**Talpa #2 Store**"), which was operated by Talpa #2. The Talpa #2 Store opened to the public on Buford Highway on April 30, 2012.

100.  Defendant Gerardo again promised Plaintiff Hilario an equity interest in Talpa #2 in exchange for managing the Talpa #2 store and getting it off the ground.

101. Because of that promise, Plaintiff Hilario worked for three months consistently, without any time off.

102. After Plaintiff Hilario began managing the Talpa #2 Store, Defendant Gerardo agreed to increase Plaintiff Hilario's equity stake in Talpa #2 to 15% to induce him to work even harder to make that store a success.

103. During the two years after Defendant Gerardo promised Plaintiff Hilario a 15% interest in the Talpa #2 profits, Plaintiff Hilario did not actually receive any profit distributions.

104. Eventually, in or about 2014, Defendant Gerardo began to make payments to Plaintiff Hilario that he deemed "profits," never did not provide Plaintiff Hilario with any documentation evidencing his equity interest in Talpa #2 until September 2016.

105. Despite Plaintiff Hilario's duties increasing over the years, his wages never changed from $500 per week. Plaintiff Hilario's only other compensation related to the Talpa stores was in the form of equity and related distributions.

106. One of the most important roles Plaintiff Hilario played for the Talpa Enterprise was interviewing and managing employees for the various stores. Plaintiff Hilario's job was to interview the prospective employee for qualifications. Once Plaintiff Hilario approved their skillsets, the prospective

employees were sent to Defendant Denisse, who was the *de facto* human resources manager for Talpa.

107.    Plaintiff Hilario later spearheaded the marketing efforts for Talpa #5. Among other things, Plaintiff Hilario personally handed out flyers at nearby churches and apartment complexes and gathered manpower to assist in that effort, labor for which he was never compensated.

## Defendant Eder Joins the Talpa Enterprise

108.    In 2012, Defendant Eder left Defendant Gerardo's bakery and joined the Talpa Enterprise, just after the Talpa #2 store opened and as the third store was being opened.

109.    Almost immediately upon joining the Talpa Enterprise, Defendant Eder became its second in command, effectively serving as Defendant Gerardo's "right hand man."

110.    Circa 2016–17, Defendant Eder took on primary responsibility for the finances of the Talpa Enterprise, effectively becoming its CFO.

111.    Beginning in 2020, Defendant Eder was listed as the CFO of, without limitation, Talpa #2, Talpa #3, Talpa #5, Talpa #6, Talpa #7, and Talpa #8.

112.    Upon information and belief, Defendant Eder has an equity interest in one or more Talpa Entities.

113.   On several occasions, Defendant Eder expressed his belief that Defendant Gerardo should "push out" other silent, minority owners (i.e., equity holders who did not participate in the day-to-day operations) from the Talpa Enterprise.

### Defendant Denisse Joins the Talpa Enterprise

114.   Circa 2013, Defendant Denisse joined the Talpa Enterprise, and was primarily responsible for the accounting, legal, banking, payroll, and human resources functions of the Talpa Enterprise.

115.   Defendant Denisse is listed as the corporate Secretary for many of the Talpa Entities. For example, beginning in 2020, Defendant Denisse was listed as the Secretary of (without limitation) Talpa #2, Talpa #3, Talpa #7, and Talpa #8.

116.   Between 2013 and 2021, Defendant Denisse oversaw the drafting and execution of all legal documentation related to the Talpa Entities. Defendant Denisse was intimately involved in the movement of funds into, out of, and among, the various Talpa Entities while overseeing the Talpa Enterprise bank accounts and accounting records.

117.   Defendant Denisse remained in her internal Talpa role until mid-2021, when she resigned as an official employee of record of Talpa to focus on managing the Staffing Companies.

118.   Upon information and belief, Defendant Denisse currently has an equity interest in one or more Talpa Entities.

**<u>Plaintiff Nicolas Induced to Invest in Talpa</u>**

119.   In addition to needing labor and management skills, and to bring his expansion plans to fruition, Defendant Gerardo needed money.

120.   Circa May 2012, Plaintiff Hilario identified a location for a third store in Marietta, which would be operated by Talpa #3 (the "**Talpa #3 Store**").

121.   The Talpa #3 Store needed significant renovations, which required funding above and beyond what its landlord was willing to provide.

122.   Defendant Gerardo did not have the capital to fund the build-out of the Talpa #3 Store, nor the working capital for Talpa #3.

123.   Defendant Gerardo approached Plaintiff Nicolas to acquire the capital necessary to open the Talpa #3 Store.

124.   Plaintiff Nicolas initially rejected Defendant Gerardo's offer, and Plaintiff Nicolas explained that if capital was needed, he could provide Defendant Gerardo with a loan rather than an equity investment. Defendant Gerardo responded that he did not know whether the stores would turn a profit and was unsure about his ability to repay a loan.

125.   Defendant Gerardo preferred that Plaintiff Nicolas enter Talpa as an equity investor.

126.   To convince Plaintiffs to invest, Defendant Gerardo promised that if the Talpa stores became profitable, he would ensure that Plaintiff Nicolas would be financially sound, with future retirement income.

127.   Because of Defendant Gerardo's promises, Plaintiff Nicolas agreed to invest in Talpa #3 and to help open the Talpa #3 Store.

128.   Plaintiff Nicolas invested $50,000 in the Talpa Enterprise and received a 10% equity stake in Talpa #3.

**Plaintiff Nicolas Buys the Talpa #5 Shopping Center**

129.   In 2013, Defendant Gerardo approached Plaintiff Nicolas to invest in, and help launch, another new store and purchase real estate to house it.

130.   Defendant Gerardo could not afford to open a new store or to purchase the real estate without Plaintiff Nicolas' investment.

131.   Defendant Gerardo and Plaintiff Nicolas identified a potential location at 2380 Club Drive Lawrenceville, Georgia 30044, where a developer had begun to build a small strip mall but abandoned construction halfway through (the "**Talpa #5 Shopping Center**").

132.  Defendant Gerardo and Plaintiff Nicolas purchased the Talpa #5 Shopping Center for approximately $1.2 million. The purchase was funded in large part by an SBA-backed loan, and Plaintiff Nicolas contributed the entire $120,000 purchase-money down-payment..

133.  The Talpa #5 Shopping Center would eventually house a store that would be operated by Talpa #5 (the "**Talpa #5 Store**") alongside other rent-paying tenants.

134.  Plaintiff Nicolas contributed $50,000 to Talpa #5 to fund the start-up working capital for the Talpa #5 Store and, in exchange, a 10% equity stake in Talpa #5.

135.  Plaintiff Nicolas made other financial contributions to the Talpa #5 Shopping Center to keep it out of foreclosure and to help Talpa #5 survive. For example, from July 2013 to December 2013, Defendant Gerardo requested from Plaintiff Nicolas $22,000 to cover half of the monthly mortgage payments for the Talpa #5 Shopping Center, which Plaintiff Nicolas paid.

136.  Plaintiff Nicolas has maintained his equity interests at all relevant times.

## **Plaintiff Nicolas's Sweat Equity**

137.  At Defendant Gerardo's request, Plaintiff Nicolas has contributed significant labor, materials, and additional resources to the Talpa Enterprise.

138.  Defendant Gerardo knew that he could not open the Talpa #3 Store or the
      Talpa #5 Store without Plaintiff Nicolas's help.

139.  Defendant Gerardo approached Plaintiff Nicolas (who owns a construction
      company) to use Plaintiff Nicolas for the construction and buildout of the
      Talpa #3 Store.

140.  Plaintiff Nicolas contributed significant labor and materials to improve the
      Talpa #3 Store.

141.  Plaintiff Nicolas has not received any compensation from any of the
      Defendants for the labor and materials he provided to the Talpa #3 Store.

142.  Similarly, Plaintiff Nicolas contributed significant labor and materials to
      complete construction of the Talpa #5 Shopping Center. Because it was an
      unfinished shell, significant construction work was needed to complete the
      construction and the build out of the Talpa #5 Shopping Center and the Talpa
      #5 Store.

143.  Plaintiff Nicolas has not received any compensation from any of the
      Defendants for the labor and materials he provided to the Talpa #5 Shopping
      Center and the Talpa #5 Store.

144.  Plaintiff Nicolas also provided uncompensated labor and materials to other
      Talpa stores.

145.  For example, at the store operated by Talpa #7 (the "**Talpa #7 Store**"), Plaintiff Nicolas painted the interior and exterior of the building, built out and painted the store's interior "palapa," and contributed a highly-specialized, industrial concrete leveling grinder to level the deficiencies in the interior cement floor.

146.  Plaintiff Nicolas has not received any compensation from any Defendant for the labor and materials he provided to the Talpa #7 Store, except his out-of-pocket labor costs for the interior painting.

147.  Similarly, Plaintiff Nicolas provided labor and materials for painting the entire exterior of the building for the Talpa #12 store, which was over 76,000 square feet.

148.  Plaintiff Nicolas, through his painting company MUH Painting, LLC, provided massive amounts of paint for the Talpa #9 store in Nashville, Tennessee and various other stores.

149.  Defendant Gerardo induced Plaintiff Nicolas to provide all of this labor and materials to the Talpa Enterprise by convincing Plaintiff Nicolas that his investment in the Talpa Enterprise would help fund his retirement.

**Defendant David Joins the Talpa Enterprise**

150.    Defendant Eder knew Defendant David for years before recruiting him to the Talpa Enterprise. By 2017, the Talpa Enterprise grew to the point that Defendant Eder believed he could have his own "right-hand man," with whom he could conspire to run the Talpa Enterprise for their mutual benefit. Defendant Eder and Defendant David worked together to push out minority owners (other than themselves and the other Individual Defendants).

151.    Circa December 2017, Defendant David joined the Talpa Enterprise. By 2018, Defendant David became the head of human resources[4], and by 2020 he had become Vice President and functioned as head of operations for the Talpa Enterprise.

152.    From the beginning of Defendant David's involvement with the Talpa Enterprise, Defendant Gerardo and Defendant Eder always intended to involve Defendant David in their plans.

---

[4]      It is believed that Defendant Denisse left Talpa to operate the Staffing Companies due, in part, to Defendant David coming in to handle human resources matters for Talpa.

153.  Shortly after Defendant David joined the Talpa Enterprise, he spearheaded an effort to shift all profits away from minority owners and store managers to the Individual Defendants.

154.  Defendant David stated on numerous occasions that it was "not fair" for minority shareholders to receive distributions on their equity investments if they did not participate in the day-to-day operations of the Talpa Enterprise.

155.  Defendant David stated to Plaintiff Hilario that "things are going to change." Defendant David stated that (a) store managers will no longer receive 10% of net profits; and (b) there would be no further investment opportunities in other Talpa stores.

156.  Defendant David changed the job titles of store managers in the Talpa Enterprise, removed their profit incentives, and redirected more of the Talpa Enterprise's profits to the Individual Defendants and away from other shareholders and managers.

157.  Shortly after Defendant David joined the Talpa Enterprise, Plaintiff Nicolas' profit distributions were reduced by $2,000 per month.

158.  A portion of Plaintiff Nicolas' profit distributions were redirected to Defendant David.

159.  Shortly after Plaintiff Nicolas' distributions were reduced, Plaintiff Nicolas called Defendant Eder and asked, "Is David going to get fat with the $2,000 he stole from me?" Defendant Eder laughed in response.

160.  Upon information and belief, Defendant David currently has an equity interest in one or more of the entities comprising the Talpa Enterprise.

## Shrouds of Secrecy

161.  From the beginning, Defendant Gerardo concealed from Plaintiff Nicolas almost all information related to the Talpa Enterprise, keeping him completely in the dark.

162.  Although Plaintiff Hilario had limited access to Talpa #2 profit and loss reports, the Individual Defendants did not provide Hilario with any information documenting his later investments in Talpa #5 and Talpa #7 or their financial reports.

163.  After the other Individual Defendants joined the Talpa Enterprise, they conspired with each other to conceal information from the Plaintiffs.

164.  The Individual Defendants refused to reveal to Plaintiffs something as simple as the identity of other equity owners in the Talpa Enterprise or basic information relating to Plaintiffs' equity interests.

165. For example, Defendant Gerardo got angry anytime Plaintiff Nicolas mentioned that he was an investor in the Talpa Enterprise. Defendant Gerardo told Plaintiff Nicolas not to mention his interest in or affiliation with the Talpa Enterprise.

166. Upon information and belief, the Individual Defendants allowed additional equity owners to buy equity in the Talpa Enterprise and never disclosed these ownership changes in any detail with any Plaintiff.

167. The Individual Defendants had good reason to fear the defrauded investors comparing notes together.

168. The Individual Defendants have intentionally concealed from Plaintiffs almost all financial information related to the Talpa Enterprise..

169. The Individual Defendants never provided financial reports to the Plaintiffs until a few months ago when requested by counsel. Even then, the reports provided were minimal, and the Individual Defendants refused to provide the vast majority of the information Plaintiffs requested.

170. The financial reports for certain Talpa Entities, prepared by an accounting firm, state that "***Management has elected to omit substantially all the disclosures ordinarily included in financial statements*** prepared in accordance with the tax basis of accounting. If the omitted disclosures were

included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, equity, revenues, and expenses. Accordingly, the financial statements are not designed for those who are not informed about such matters." (emphasis added).

171. Plaintiffs are not informed regarding what "such matters" the Individual Defendants have refused to disclose.

172. Plaintiffs never received any explanation of how their equity investments were treated or the basis of the Talpa Enterprise profit distributions to which they were entitled.

173. The Individual Defendants outright refused to provide basic information to which the Plaintiffs are entitled, including, without limitation, audited financials, complete tax returns, bank statements, an organizational chart, information regarding other equity holders' capital accounts, and basic information regarding the percentage ownership of other shareholders and members.

## **Fraudulent and Coerced Documentation**

174. Upon information and belief, much of the legal documentation upon which the Defendants will likely rely was obtained by fraudulent means and/or duress.

175. The Individual Defendants have coerced the Plaintiffs into signing documents that were for the Individual Defendants' benefit and contrary to the Plaintiffs' interests.

176. The Individual Defendants misrepresented and/or failed to disclose the complete ownership and capitalization structure when they sold Talpa securities to Plaintiffs.

177. The Individual Defendants know that Plaintiff Hilario does not read English.

178. The Individual Defendants know that Plaintiff Nicolas has an extremely limited ability to read English.

179. Nevertheless, the Individual Defendants presented documents written in English for both Plaintiff Hilario and Plaintiff Nicolas to sign.

180. The Individual Defendants deceived the Plaintiffs into signing documents by misrepresenting the contents of those documents and/or failing to disclose material facts regarding the contents of these documents.

181. On several occasions, Defendant Gerardo convinced Plaintiff Nicolas to provide signatures to documents that were never shown to Plaintiff Nicolas. For example, Defendant Gerardo requested that Plaintiff Nicolas provide a signature on a blank signature page, which would then be appended to whatever document Defendant Gerardo unilaterally chose.

182. Upon information and belief, Defendant Denisse was complicit in these schemes and assisted Defendant Gerardo in creating fraudulent documentation.

183. The Plaintiffs felt compelled to sign any documents that the Individual Defendants required them to sign out of fear that they would be "removed" from the Talpa Enterprise, and their profit distributions terminated.

## Secret Ownership Shuffling

184. In Defendant Gerardo's mind, the Talpa Entities are "his" to do with as he pleases, regardless of the Plaintiffs' rights.

185. Defendant Gerardo believes that he can "remove" minority owners of "his" entities and change ownership whenever he feels like it.

186. Upon information and belief, Defendant Gerardo has made numerous ownership changes to various entities in the Talpa Enterprise without disclosing those changes to the Plaintiffs, much less asking their permission, which caused Plaintiffs' equity interests to become diluted.

187. Upon information and belief, Defendant Gerardo seeks to continue making ownership changes to further dilute the Plaintiffs' equity interests.

## The Talpa #5 Shopping Center Bait-and-Switch

188.   Defendant Gerardo and Plaintiff Nicolas formed a real estate holding entity in 2012, N&G Management, LLC ("**N&G Management**"), to hold and own the Talpa #5 Shopping Center.

189.   Plaintiff Nicolas provided 100% of the capital for N&G Management to purchase the Talpa #5 Shopping Center.

190.   Defendant Gerardo induced Plaintiff Nicolas to invest the funds necessary to purchase the Talpa #5 Shopping Center by representing to Plaintiff Nicolas that the two of them would be equal 50/50 owners of N&G Management.

191.   Defendant Gerardo's representation was a lie, as he had no intention of being equal partners with Plaintiff Nicolas.

192.   After Plaintiff Nicolas invested the purchase money for the Talpa #5 Shopping Center, and without Plaintiff Nicolas' knowledge or consent, Defendant Gerardo and/or Defendant Denisse forged Plaintiff Nicolas' signature to documents that purportedly gave 80% of the equity in N&G Management to Defendant Gerardo and only 20% of the equity interests to Plaintiff Nicolas.

193.   Plaintiff Nicolas would never have provided the startup capital for N&G Management if he had not received at least 50% of its equity interests.

194.   When Plaintiff Nicolas first discovered Defendant Gerardo's deception at a meeting with Defendant Gerardo's accountant (at which Plaintiff Blanca was present), Plaintiff Nicolas rejected Defendant Gerardo's attempt to take 80% of the equity in N&G Management (hereinafter referred to as the "**Shopping Center Bait and Switch**"). Plaintiff Nicolas demanded that Defendant Gerardo correct the documentation to accurately reflect the 50/50 agreement that induced Plaintiff Nicolas to provide the funding for N&G Management to purchase the Talpa #5 Shopping Center.

195.   Defendant Gerardo's accountant falsely stated that a 50/50 split of ownership between Plaintiff Nicolas and Defendant Gerardo was "not possible."

196.   In reality, Defendant Gerardo disfavored the 50/50 ownership split because he never intended to honor his promises to Plaintiff Nicolas, which convinced Plaintiff Nicolas to purchase the Talpa #5 Shopping Center. Defendant Gerardo was determined to have the largest equity interest in N&G Management, despite having provided none of the startup capital, or the labor and materials that Plaintiff Nicolas provided to construct the Talpa #5 Shopping Center.

197. Ultimately, a compromise was reached where the 50% interest that Defendant Gerardo promised to Plaintiff Nicolas was divided among Plaintiff Nicolas and two other members of his family (Plaintiffs Uriel and Blanca).

198. Defendant Gerardo agreed to this split because he incorrectly believed that his plurality 50% ownership would enable him to control the voting and management of N&G Management.

199. Accordingly, the ownership of N&G Management was structured as 50% owned by Defendant Gerardo, 20% owned by Plaintiff Nicolas, 15% owned by Plaintiff Uriel, and 15% owned by Plaintiff Blanca.

200. Defendant Gerardo falsely represented to Plaintiff Nicolas that structuring the transactions this way was done "on advice from his accountant."

201. The Delgado Plaintiffs have maintained their equity interests in N&G Management at all relevant times.

202. N&G Management issued K-1 forms to Plaintiff Uriel and Plaintiff Blanca from 2013 to 2019 indicating that N&G Management was profitable and that they would be personally liable for their respective portions of the taxes on those profits.

203. N&G Management never distributed any profits to Plaintiff Uriel or Plaintiff Blanca.

204.   Plaintiff Uriel and Plaintiff Blanca were forced to pay taxes on N&G Management's profits despite never receiving any distributions of any of those profits.

205.   Circa 2019, Plaintiff Uriel complained about having to pay taxes on profits he never received.

206.   Plaintiff Nicolas relayed Plaintiff Uriel's concerns to Defendant Gerardo.

207.   In response, Defendant Gerardo told Plaintiff Nicolas that he would have Defendant Denisse "take Plaintiff Uriel off" of N&G Management.

208.   Circa 2020, Defendant Gerardo and Defendant Denisse caused N&G Management to: (a) send K-1 forms to Plaintiff Nicolas indicating that he had become 50% owner of N&G Management; and (b) stop sending K-1 forms to Plaintiff Uriel or Plaintiff Blanca.

209.   Neither Plaintiff Uriel nor Plaintiff Blanca ever signed any document related to any sale or transfer of their interests in N&G Management.

**Defendants Force Hilario to Open Trucking Company**

210.   In 2013 and 2014, Defendant Gerardo used Plaintiff Hilario as a straw buyer to purchase and finance two trucks for use in the Talpa Enterprise. Defendant Gerardo was personally unable to finance the trucks.

211.   The two trucks were put in Plaintiff Hilario's name, making him personally liable for the financing of the two trucks.

212.   Despite that Plaintiff Hilario was personally liable for the trucks, Defendant Gerardo, Defendant Eder, and Defendant Denisse wanted to control the trucks for use in the Talpa Enterprise. Without being the owners, these individual Defendants were not able to obtain insurance, schedule maintenance, or other important tasks associated with logistics from one Talpa Entity to another.

213.   For that reason, in early 2016, Defendant Gerardo and Defendant Eder told Plaintiff Hilario that he needed to form a company so that they could operate the trucking services for the Talpa Enterprise.

214.   HJRM TRUCKING, INC. (the "**Trucking Company**") was formed by Defendants Gerardo, Eder, and Denisse and was placed in Plaintiff Hilario's name.

215.   Plaintiff Hilario never met the attorney who incorporated the trucking company and he did not have access to the records of the Trucking Company with the Secretary of State's office. These records were maintained and controlled by Defendant Denisse.

216.   Defendant Gerardo and Defendant Eder insisted that the Trucking Company must be in Plaintiff Hilario's name because they: (a) sought to shield

themselves and the Talpa Enterprise from any liability related to the Trucking Company; (b) sought to shift any such liabilities to Plaintiff Hilario; (c) did not have the creditworthiness to finance the commercial trucks; and (d) did not want to obtain the necessary commercial driver's license.

217. Plaintiff Hilario did not want the Trucking Company in his name, but Defendant Gerardo and Defendant Eder coerced him to sign the relevant documents. Plaintiff Hilario did not believe he had a choice in signing.

218. Upon information and belief, the Defendant Denisse hired an attorney, Lisa Gable, to form the Trucking Company and caused all of the legal documents regarding the Trucking Company to be drafted, signed, and filed.

219. Plaintiff Hilario was forced by Defendants Gerardo, Eder, and Denisse to sign documents under duress.

220. Although Plaintiff Hilario always owned the Trucking Company, Defendants Gerardo, Eder, and Denisse have managed that company without any significant involvement from Plaintiff Hilario.

221. The setup of the Trucking Company is one example of the regular practice of Defendants Gerardo and Eder, using "strawmen" as nominal owners to shield themselves.

222. At the insistence of Defendants Gerardo and Eder, Plaintiff Hilario took on personal liability from the Trucking Company and its operations.

223. Plaintiff Hilario paid certain expenses of the Trucking Company out of his own pocket, such as vehicle payments and insurance.

224. Plaintiff Hilario's only compensation from the Trucking Company was $500 per month, which was paid to him as hourly wages through a staffing company.

225. Defendant Gerardo used funds from Talpa #2 to pay for certain expenses of the Trucking Company.

226. Every year the Trucking Company has shown a taxable loss for many expenditures that are not its responsibility.

227. The Trucking Company appears to pay GA Staffing Solutions, Inc. for contracted labor, but Plaintiff Hilario never knew or authorized that relationship and has never been included on any contracts or other documents between the two entities.

228. Plaintiff Hilario has minimal knowledge or understanding of the Trucking Company operations, despite being the sole shareholder, because Defendants Gerardo, Eder, and Denisse have operated the Trucking Company in secrecy.

229. Defendants never paid the fair market value for services rendered by Plaintiff Hilario personally nor the services provided by the Trucking Company (the "**Insider Excess Pay**").

230. In fact, upon information and belief, compensation for the trucking services was actually paid to the Warehouse Entity. Those fraudulently converted profits from the Trucking Company were subsequently paid to the Individual Defendants from the Warehouse Entity as purported wages, overtime, bonuses, and profits.

## **Defendants Use Plaintiff Nicolas's Identity and Credit**

231. On numerous occasions, the Defendants and their agents used Plaintiff Nicolas' identity and credit and forced Plaintiff Nicolas to seek compensation for debts they fraudulently incurred in his name and without his consent.

232. For example, Plaintiff Nicolas has trade credit accounts with Home Depot and Sherwin Williams, which enables him to buy paint and other construction materials on credit at discounted contractor prices (the "**Trade Accounts**").

233. On a single occasion, Plaintiff Nicolas gave the Defendants permission to use the Trade Accounts.

234. Thereafter, without his knowledge or consent, the Defendants continued using the Trade Accounts to purchase materials for various locations in Georgia and Tennessee.

235. Plaintiff Nicolas only discovered that the Defendants had used his identity and credit when he received surprise unauthorized charges for materials he did not purchase.

236. Plaintiff Nicolas was forced to make repeated requests for compensation from the Defendants for the unauthorized charges they made on the Trade Accounts.

**Plaintiff Hilario Finally Receives Equity Documentation**

237. In September 2016, over four years after Plaintiff Hilario was promised an equity interest in Talpa #2, his equity interest was formally documented, despite that he had received K-1 reports every year since his sweat equity contributions began in 2012.

238. From 2012 through 2015, Plaintiff Hilario received K-1 documents from the Individual Defendants that showed a 16% ownership in Talpa #2. However, the distributions listed in those K-1's were never fully paid to him.

239. On September 8, 2016, Plaintiff Hilario was presented with and signed the *Supermercado Talpa #2, Inc. Shareholders Agreement* ("**Talpa #2**

**Shareholder Agreement**"). In the Talpa #2 Shareholder Agreement, Plaintiff Hilario received 150 of 1,000 total shares for a 15% ownership in Talpa #2.

240.   Defendant Gerardo and his mother, Celia, were listed as the other two Talpa #2 shareholders with Defendant Gerardo owning 750 shares and Celia owning 100 shares, constituting 75% and 10% of the equity interests, respectively.

241.   Plaintiff Hilario maintained his equity interest at all relevant times and has never signed any documents to transfer any of his Talpa #2 equity.

## Plaintiff Hilario Invests in Talpa #7

242.   Circa late 2017 or early 2018, Plaintiff Hilario asked Defendant Gerardo if there were other opportunities to invest in the Talpa Enterprise.

243.   Defendant Gerardo told Plaintiff Hilario that he could invest in Talpa #7.

244.   On March 16, 2018, Defendant Gerardo texted Plaintiff Hilario and asked for $100,000 (payable as $70,000 by check and $30,000 in cash) as payment for a 10% equity interest in Talpa #7. Defendant Gerardo asked Plaintiff Hilario to send a copy of his driver's license and social security card to Defendant Gerardo's email address.

245.   Plaintiff Hilario sent the money by cash and check and emailed his personal documents to Defendant Gerardo.

246.   Defendant Gerardo valued Talpa #7 at $1,000,000, so the $100,000 was
       represented to Plaintiff Hilario as a 10% interest, but Plaintiff Hilario was
       never provided proof of the valuation or the method by which the Talpa #7
       equity was valued.

247.   Plaintiff Hilario signed paperwork for Talpa #7, but was never provided
       copies of those documents, even upon request. Present at the signing of the
       Talpa #7 documents were Plaintiff Hilario and Defendant Denisse.

248.   Plaintiff Hilario did not work in Talpa #7, but he has maintained his equity
       interest at all relevant times.

**Plaintiff Hilario Defrauded Into Investing in Talpa #5**

249.   Circa early 2020, Defendant Gerardo invited Plaintiff Hilario to travel in
       Defendant Gerardo's private aircraft. Defendant Gerardo then asked Plaintiff
       Hilario to invest $80,000 in Talpa #5 in exchange for 10% equity.

250.   Soon after that discussion, Plaintiff Hilario transferred $80,000 to Talpa #5 by
       delivering two checks, one for $65,000 and one for $15,000 (dated January
       31, 2020, and February 19, 2020).

251.   Defendant Gerardo concealed nearly all material facts related to the purported
       equity interests that he claimed to sell to Plaintiff Hilario.

252. Defendant Gerardo lied to Plaintiff Hilario regarding how his equity in Talpa #5 would be reflected in legal documents. Specifically, Defendant Gerardo told Plaintiff Hilario he was purchasing the 10% interest of an individual named Marcos. In reality, Marcos had sold or transferred his ownership interest in Talpa #5 long before Plaintiff Hilario's investment..

253. Plaintiff Hilario requested copies of the legal documentation regarding his Talpa #5 investment numerous times, but no documentation was ever produced.

254. Shortly after Plaintiff Hilario transferred the investment funds, the Individual Defendants revealed their intent to defraud Plaintiff Hilario and not honor the agreement to make him an equity owner.

255. Defendant Eder and Defendant David confronted Plaintiff Hilario and told him that he did not deserve ownership in the Talpa Enterprise. Defendants Eder and David made inflammatory, offensive comments intended to inflict emotional distress upon Plaintiff Hilario, to wit: that he should be ashamed of himself because he does not speak English well and that his children must be ashamed of him.

256. Defendant Eder and Defendant David purported to "put Plaintiff Hilario on probation" and threatened to fire him in six months if he did not "improve his performance."

257. Contrary to Defendant Eder and Defendant David's assertions, Plaintiff Hilario was one of the best and most loyal employees of the Talpa Enterprise.

258. Approximately two weeks after Plaintiff Hilario made the $80,000 transfer, Defendant Gerardo went to Plaintiff Nicolas and requested that he sign certain documents related to Talpa #5. The documents presented by Defendant Gerardo to Plaintiff Nicolas did not mention Plaintiff Hilario.

259. Defendant Gerardo lied to Plaintiff Nicolas regarding the nature of the documents presented for signature, stating that they were related to a purchase of equity by Defendant Eder.

260. Under duress that Defendant Gerardo would squeeze him out of the Talpa Enterprise and freeze his profit distributions, Plaintiff Nicolas signed the documents.

261. Plaintiff Nicolas believes he may have signed other documents under duress, but he has not been provided copies of complete documents.

262. Defendant Gerardo never disclosed to Plaintiff Nicolas that he sold equity in Talpa #5 to Plaintiff Hilario.

263.   The Individual Defendants conspired to defraud Plaintiff Hilario out of his equity investment in the Talpa Enterprise.

264.   Upon information and belief, one or more of the Individual Defendants misappropriated the funds that Plaintiff Hilario was led to believe he had invested in Talpa #5.

265.   Upon information and belief, Defendant Eder is the shareholder identified as the owner of the 10% equity interest Plaintiff Hilario purchased.

266.   Upon information and belief, Defendant Eder never contributed any personal funds to become a shareholder of Talpa #5. Neither Plaintiff Nicolas nor Plaintiff Hilario ever agreed to share Talpa #5 equity with Defendant Eder.

## No Respect for Formalities and Rights

267.   The Individual Defendants never respected the purported separateness of the Talpa Entities.

268.   The corporate records of the Talpa Entities were not properly maintained.

269.   Section 2.2 of the Talpa #3 and Talpa #5 bylaws provide that shareholder meetings should be held annually. Section 2.4 provides that notices of meetings would be provided with at least 10–60 days' notice.

270.   Plaintiffs never received notice for any shareholder meetings for any of the Talpa Entities in which they hold shares.

271.   Upon information and belief, no shareholder meetings have ever taken place for Talpa #2, Talpa #3, Talpa #5, or Talpa #7.

272.   No shareholder votes were ever held for any corporate action taken by Talpa #2, Talpa #3, Talpa #5, or Talpa #7, including the removal and succession of corporate officers in any of these entities.

273.   Section 7 of the shareholders agreements for Talpa #2 and Talpa #5 provides that the value of the shares of the respective entities would be evaluated and re-established every two years.

274.   Pursuant to these Agreements, at the time of execution, the Talpa #2 and Talpa #5 shares were valued at $1,800,000, with a shareholder value redetermination mandated every two years from the date of the agreement's execution.

275.   Defendant Gerardo never met with the Plaintiffs to conduct a redetermination of the value of Talpa #2's or Talpa #5's shares.

276.   No valuation of the shares of Talpa #2, Talpa #3, Talpa #5, or Talpa #7 has ever been made.

277.   With respect to N&G Management, the operating agreement named both Plaintiff Nicolas and Defendant Gerardo as managing members.

278. Defendant Gerardo improperly excluded Plaintiff Nicolas from management, concealed books and records, and took fraudulent actions against N&G Management assets beyond Defendant Gerardo's authority.

## **Profits Misappropriated from the Beginning**

279. From the beginning, Defendant Gerardo withheld profit distributions from Plaintiffs and took money from them, misappropriating it for his own use, either by converting the money for his personal use or investing it in other Talpa Entities.

280. After joining the Talpa Enterprise, the other Individual Defendants conspired with Defendant Gerardo to misappropriate funds to which the Plaintiffs were rightfully entitled.

281. The Individual Defendants never explained to the Plaintiffs the basis upon which any profit distributions were calculated.

282. The Individual Defendants never disclosed to any Plaintiff how much any of the Individual Defendants received in profit distributions from any of the Talpa Entities.

283. The Individual Defendants have conspired to conceal from Plaintiffs all information regarding the profitability of the Talpa Enterprise and where this money went.

284. The Individual Defendants never provided any information to Plaintiffs regarding any re-investment of profits related to any of the entities in which Plaintiffs have ownership interests.

285. There exists no correlation between the profitability of the Talpa Entities and the distributions that were made to Plaintiffs.

286. For example, two years after he was promised an equity stake in Talpa #2, Plaintiff Hilario finally received "profit distributions" in 2014. Plaintiff Hilario received a flat amount of $1,000 or $2,000 per month that Defendant Eder represented as the "15% profits."

287. Similarly, the distributions Plaintiff Hilario received from Talpa #5 and Talpa #7 rarely varied from month to month.

The distributions listed on the various K-1 forms provided by the Individual Defendants to Plaintiff Hilario never reflected the actual amount of distributions he received.

288. Plaintiff Hilario never received any accounting or explanation regarding the "profit distributions" from the Talpa Enterprise. When Plaintiff Hilario questioned the discrepancies, he was told "the accountants said that's the way it has to be."

289. Similarly, Plaintiff Nicolas received $10,000 per month in profit distributions related to his investments in Talpa #3 and Talpa #5, which was later reduced to $8,000 per month shortly after Defendant David joined the Talpa Enterprise. Plaintiff Nicolas' distributions were reduced without any explanation from any of the Individual Defendants regarding how these amounts were calculated, despite numerous requests for production.

290. The Talpa #5 Shopping Center has several other rent-paying tenants other than the Talpa #5 store. Since 2014, the Shopping Center has been at or near full occupancy and has generated significant rent revenue.

291. Talpa #5 pays below-market rent to N&G Management.

292. N&G Management is profitable.

293. Neither Plaintiff Uriel nor Plaintiff Blanca ever received any distributions from N&G Management.

294. Plaintiff Nicolas only received distributions from N&G Management in a few years, and received nothing in most years, without any explanation as to why or why not.

## **Phantom Profits on the K-1 Forms**

295. The Individual Defendants routinely sent K-1 forms to the Plaintiffs that indicated that the Plaintiffs' portions of the profits were far in excess of what the Plaintiffs actually received.

296. For example, with respect to Talpa #3 and Talpa #5, between 2013 and 2021, Plaintiff Nicolas received more than $287,000 *less* in profit distributions than the total amounts reported on the K-1 forms.

297. Plaintiff Uriel and Plaintiff Blanca never received distributions from N&G Management, but, from 2013-2019, they received K-1 forms indicating that they were entitled to profits in excess of $80,000 in aggregate.

298. Similarly, Plaintiff Hilario has received K-1 tax forms each year for his ownership in Talpa #2, Talpa #5, and Talpa #7. However, the amounts shown on the K-1 forms have consistently shown profits much higher than the actual distributions that Plaintiff Hilario received.

299. For example, in 2021, Plaintiff Hilario received significantly less in distributions for Talpa #2, Talpa #5, and Talpa #7 than the K-1 forms indicated.

300. Because of the Individual Defendants' actions, the Plaintiffs were forced to personally pay additional taxes based on purported profits that they never received (collectively the "**Misappropriated Distributions**").

301. None of the Individual Defendants ever explained to any of the Plaintiffs why the amounts shown on the K-1 forms were so much higher than the profit distributions they actually received (which in some cases were zero).

302. Plaintiff Nicolas knew that if he ever asked questions about the amounts of the distributions, Defendant Gerardo would get angry, so he kept his mouth shut for years.

303. In April 2022, individually and unbeknownst to the other, Plaintiffs Nicolas and Hilario asked about the large discrepancies in profit distributions versus 2021 K-1 stated distributions because both were facing tax liabilities for profits they never received.

304. When Plaintiff Hilario asked Defendant Eder about the discrepancy, Defendant Eder scoffed and asked, "Do you need the money?" Plaintiff Hilario told him that his tax bill was going to be six figures and he did not have the money for that. Defendant Eder acknowledged that there was "an error" with the profits listed but to "go ahead with taxes because there was no

problem." To appease Plaintiff Hilario, Defendant Eder paid Plaintiff Hilario's taxes.

305. Similarly, Plaintiff Nicolas (through Plaintiff Blanca) asked Defendant Eder why his K-1 showed approximately $120,000 more than he actually received. Defendant Eder responded by "finding the money" and paying Plaintiff Nicolas approximately $120,000 collectively from Talpa #3 and Talpa #5 that had not been paid previously.

### **Pattern of Defendants Stealing Plaintiffs' Profits**

306. The reason the Individual Defendants were secretive regarding the Talpa Enterprise finances is that they stole money from Plaintiffs and misappropriated that money for themselves, re-directing Plaintiffs' money to entities and assets that they own but that Plaintiffs have no equity interest in.

307. Upon information and belief, one or more of the Individual Defendants have taken profit distributions from Talpa #2, Talpa #3, Talpa #5, Talpa #7, and N&G Management in excess of what they were legally entitled.

308. For example, the balance sheet for N&G Management shows that Defendant Gerardo took a $26,000 "loan" from N&G Management that was never disclosed to any of the Delgado Plaintiffs.

309.  The Individual Defendants have caused funds to be transferred from Talpa #2, Talpa #3, Talpa #5, Talpa #7, and/or N&G Management (the "**Plaintiff-Owned Entities**") to other Talpa Entities.

310.  There are numerous examples where the Individual Defendants caused money to be transferred from the Plaintiff-Owned Entities to other Talpa Entities, including without limitation:

a. The Individual Defendants transferred over one million dollars from N&G Management to purchase a Nashville, Tennessee property that houses the Talpa #9 store. Subsequently, the Individual Defendants redirected the same monies into a Gainesville, Georgia property to house the Talpa #11 store without disclosing these transactions to Plaintiff Nicolas (explained in more detail below).

b. El Supermarket Distributor, Inc. took a $26,000 "loan" from N&G Management that was never disclosed to any of the Delgado Plaintiffs.

c. Talpa #3 made a "loan" in the amount of $165,000 to Service Meat Distributors, LLC that was never disclosed to Plaintiff Nicolas.

d. Talpa #5 made a "loan" in the amount of $245,000 to Service Meat Distributors, LLC that was never disclosed to Plaintiff Nicolas or Plaintiff Hilario.

e. The Individual Defendants have used Talpa #5 profits that should have been distributed to Plaintiff Hilario and Plaintiff Nicolas to fund startup working capital costs and to cover payroll at Talpa #12.

311.  A significant portion of funds that were transferred from the Plaintiff-Owned Entities should have been distributed as profits to the Plaintiffs instead of being transferred to entities and assets in which the Plaintiffs do not hold a legal interest.

312.  Because the Plaintiffs' funds were improperly transferred to other Talpa Entities and commingled amongst them, the Plaintiffs hold equitable interests in all of the Talpa Entities, all of their assets, and the entire Talpa Enterprise.

## The Shopping Center Cash-Out, Roll-Up, and Roll-Over

313.  One of the most egregious examples of the Defendants misappropriating Plaintiff funds was Defendant Gerardo secretly cashing out the equity of the Talpa #5 Shopping Center and rolling that money into starting the Nashville store operated by Talpa #9, which was subsequently cashed out and rolled over into the Gainesville store operated by Talpa #11.

314.  The Talpa #5 Shopping Center has appreciated significantly in value since Plaintiff Nicolas funded its purchase.

315. In September 2019, Defendant Gerardo caused N&G Management to become a borrower on a loan with Ameris Bank for approximately $2.278 million (the "**Shopping Center Loan**"), purportedly pledging the Talpa #5 Shopping Center as collateral.

316. Defendant Gerardo never disclosed the Shopping Center Loan to the Delgado Plaintiffs, much less ask their permission.

317. The proceeds of the Shopping Center Loan were at least $1 million in excess of the prior indebtedness owed on the initial loan used to purchase the Talpa #5 Shopping Center.

318. In other words, the Shopping Center Loan constituted a "cash out" refinance of the initial loan on the Talpa #5 Shopping Center that converted over $1 million of the equity in the Talpa #5 Shopping Center into cash in N&G Management's bank account (the "**Shopping Center Cash-Out**").

319. The reason it was possible to perform a "cash-out" refinance on the Talpa #5 Shopping Center was that the Shopping Center had increased in value significantly, allowing N&G Management to "tap into" its equity.

320. Defendant Gerardo did not disclose the Shopping Center Loan or the Shopping Center Cash-Out to any of the Delgado Plaintiffs, much less give them their share of the cash-out profits.

321.  By further encumbering the Talpa #5 Shopping Center, Defendant Gerardo decreased the value of N&G Management.

322.  Defendant Gerardo conspired with the other Individual Defendants to use the funds obtained in the Shopping Center Cash-Out to buy new properties and launch new stores, to the exclusion of the Delgado Plaintiffs, in an effort for the Individual Defendants alone to profit from the fruits of Plaintiff Nicolas' original investment.

323.  The other Individual Defendants conspired with Defendant Gerardo and were aware of the Shopping Center Cash-Out.

324.  Defendant Gerardo caused not less than $1,255,589 to be transferred from N&G Management to Plaza Talpa Nashville, LLC (the "**Roll-Up**").

325.  Plaza Talpa Nashville, LLC holds the real estate that houses the store operated by Talpa #9.

326.  Subsequently, one or more of the Individual Defendants caused Plaza Talpa Nashville, LLC to perform another cash-out refinance of the Nashville property and then rolled over the proceeds of that second cash-out into funding the startup of the store in Gainesville, Georgia operated by Talpa #11 (the "**Roll-Over**").

327. Upon information and belief, some of the funding from the Shopping Center Cash-Out, Roll-Up and Roll-Over was transferred to Talpa #9, Talpa #11, and other Talpa Entities to cover working capital costs.

328. Accordingly, the Delgado Plaintiffs hold equitable interests in, without limitation, 2411 Lockerly Pass, Plaza Talpa Nashville, LLC, Talpa #9, Talpa #11, and all other entities to which any funds can be traced back to the Shopping Center Cash-Out.

## Misappropriation of Funds for Personal Use

329. As a result of their improper actions, the Defendants have enriched themselves, increased the value of assets they own, and purchased additional assets in part with funds that rightfully belonged to the Plaintiffs.

330. Defendant Gerardo has used funds that rightfully belonged to the Plaintiffs to purchase assets for himself.

331. For example, less than a month after the Shopping Center Cash-Out, on October 7, 2019, Defendant Gerardo purchased a large house located at 2411 Lockerly Pass, Duluth, Georgia 30097, in the Sugarloaf TPC Country Club ("**2411 Lockerly Pass**").

332. Defendant Gerardo used funds obtained in the Shopping Center Cash-Out to purchase 2411 Lockerly Pass.

333. Defendant Gerardo used funds that rightfully belonged to the Delgado Plaintiffs to purchase certain assets, including without limitation 2411 Lockerly Pass.

334. Accordingly, the Delgado Plaintiffs hold an equitable interest in all such assets, including without limitation 2411 Lockerly Pass.

335. The Delgado Plaintiffs are entitled to some or all of the net value of 2411 Lockerly Pass, including any appreciation thereof.

## Cash Skimming and Embezzlement

336. Not all of the Individual Defendants' schemes to steal money from the Plaintiffs involve complex financial maneuvering—in some cases they simply stole cash.

337. The grocery store business is a largely cash business, with over half of the Talpa Enterprise's revenue coming in the form of cash.

338. Accordingly, significant opportunities exist for those in control of the flow of that cash (*i.e.*, the Individual Defendants) to direct where that cash goes, whether it be to legitimate uses or into their own pockets.

339. Up until approximately 2017, the Talpa Enterprise had no cash controls in place. Employees were routinely paid in cash; in fact, one employee's main job was to drive around and hand out cash to employees. It was only *after* it

was discovered that an employee had embezzled that controls were put into place.

340. Upon information and belief, the Individual Defendants took cash from the Talpa Entities without reporting to Plaintiffs the amount they took (the "**Cash Embezzlement**").

341. The Individual Defendants took cash for themselves that should have gone to one or more Plaintiff as profit distributions.

342. For example, circa April 2014, Plaintiff Blanca was at Defendant Gerardo's family home, helping them look for car keys they had misplaced, when she discovered in a hallway drawer an envelope full of cash with Plaintiff Nicolas' name on it, but she said nothing. That envelope was never delivered to Plaintiff Nicolas—Defendant Gerardo kept the money.

343. The Defendants never informed Plaintiffs how much cash they took out of any Plaintiff-Owned Entity.

344. Upon information and belief, up until at least 2018 or 2019, the Individual Defendants concealed massive amounts of revenue and profits not only from Plaintiffs, but also from various taxing authorities, operating a massive tax evasion scheme, unbeknownst to Plaintiffs.

## The Staffing Companies

345.   In 2017, after the employee embezzlement issue was discovered, the Individual Defendants needed a new system to pay employees that did not involve cash distribution .

346.   The problem, however, was that the vast majority of the Talpa Enterprise employees were undocumented migrants who were not authorized to work in the United States.

347.   Concerned about potential liability related to their employment practices, the Individual Defendants set up new entities that they believed would shield them.

348.   Defendant Denisse formed approximately ten Staffing Companies.

349.   Upon information and belief, Defendant Denisse and one or more of the other Individual Defendants hold equity interests in the Staffing Companies.

350.   Most Talpa Enterprise employees receive their paychecks from one or more of the Staffing Companies.

351.   The Individual Defendants are well-aware that most of the Talpa Enterprise employees are undocumented.

352.   The official Talpa Enterprise policy is that the hiring managers need to instruct potential new hires to provide evidence of work authorization in the United States and a social security number.

353.   Hiring managers are instructed to remain silent if, and when, a potential new hire suggests that they could obtain fraudulent documentation and/or a fake social security number..

354.   The Talpa Enterprise has a "don't ask don't tell" policy when it comes to fraudulent employment documentation.

355.   The Individual Defendants are complicit in providing fraudulent documentation to the United States government.

356.   Many of the Talpa Entities, including without limitation Talpa #2, Talpa #3, Talpa #5, and Talpa #7, transfer money to the Staffing Companies to purportedly cover payroll and related taxes, benefits, and other labor obligations (collectively the "**Payroll Costs**").

357.   The Staffing Companies have received compensation from Talpa #2, Talpa #3, Talpa #5, and Talpa #7 in excess of the actual Payroll Costs (the "**Staffing Company Overpayments**").

358.   The Staffing Companies are profitable.

359. By redirecting funds from Talpa #2, Talpa #3, Talpa #5, and Talpa #7 to the Staffing Companies via the Staffing Company Overpayments, the Individual Defendants have redirected to the Staffing Companies, and ultimately themselves, profits that would otherwise be rightfully due to the Plaintiffs.

360. The Staffing Companies cannot properly report payroll taxes to the appropriate governmental authorities because of the rampant fraudulent documentation and fake social security numbers.

361. Upon information and belief, the Staffing Companies are not paying the payroll taxes transferred from other Talpa Entities and withheld from employees' paychecks to the proper governmental authorities.

362. Instead, upon information and belief, the Individual Defendants are "pocketing" the excess funds transferred to the Staffing Companies and/or redirecting those funds to other Talpa Entities in which they hold equity interests (but in which the Plaintiffs do not).

## **Overpayments to Other Entities**

363. The Staffing Companies are not the only Talpa Entities to which the Individual Defendants have redirected funds to keep most Talpa Enterprise profits to themselves and to Plaintiffs exclusion.

364. For example, the Talpa stores utilize a warehouse, owned by El Supermarket Distributor, Inc. (the "**Warehouse Entity**"), to purchase and stock inventory and deliver that inventory to the stores as needed.

365. The Individual Defendants have never disclosed to any of the Plaintiffs the identity of the owner(s) of the Warehouse Entity.

366. Upon information and belief, Defendant Gerardo, Defendant Eder, and Defendant David are equity holders in the Warehouse Entity.

367. The Warehouse Entity charges each of the Operating Entities for the products it provides to the Talpa stores.

368. The prices the Warehouse Entity charges exceed its costs, enabling the Warehouse Entity to profit at the expense of the Operating Entities (the "**Excess Charges**").

369. The Warehouse Entity charges each of the Operating Entities "rent" to supposedly cover the Warehouse Entity's overhead and other administrative costs (the "**Warehouse Rent**," and collectively with the Excess Charges, the "**Warehouse Overpayments**").

370. In reality, the Warehouse Rent has no connection to the warehouse operational costs but are instead a scheme for the Individual Defendants to siphon profits to which the Plaintiffs are entitled.

371.   For example, when new stores are added to the Talpa Enterprise, the percentage of "rent" paid to the Warehouse Entity by each Store Operating Entity is not reduced, leading to increased profits for the Warehouse Entity.

372.   The Warehouse Entity has been profitable in recent years.

373.   Similarly, upon information and belief, one or more of the Defendants own Service Meat Distributors, LLC (the "**Meat Distributor**").

374.   The Individual Defendants used funds taken from the Plaintiff-Owned Entities to launch the Meat Distributor.

375.   The Meat Distributor purchases meat in bulk and distributes the purchased meat among the Talpa stores, charging the Operating Entities for the meat provided.

376.   The Meat Distributor charged the Operating Entities above-market prices for the wholesale meat provided (the "**Meat Distributor Overpayments**").

377.   The Meat Distributor was profitable in recent months.

378.   By making the Meat Distributor Overpayments, the Individual Defendants shifted profits from the Plaintiff-Owned Entities to the Meat Distributor, thus siphoning profits to which the Plaintiffs are entitled.

## **Fraudulent Insider Employee "Overtime" and "Bonuses"**

379.   Another scheme for the Individual Defendants to siphon profits from Plaintiff Nicolas and Plaintiff Hilario was by paying themselves massive salaries, with inappropriate "overtime" and "bonuses."

380.   There are numerous examples of the inappropriate payments referenced by paragraph 381, including without limitation:

a. In addition to receiving salaries from various entities, Defendant Gerardo received hundreds of thousands of dollars in "overtime" pay, despite that Defendant Gerardo is not actually an hourly employee.

b. In 2019, Defendant David received a $12,000 "bonus" from Talpa #7.

c. In 2020, Defendant David received a $64,000 "bonus" from Talpa #7.

d. In July 2022, Defendant Eder received a "bonus" from Talpa #2 in the amount of $10,000.

381.   The Individual Defendants have never informed Plaintiffs how much in employee "overtime" or "bonuses" have been paid out of Talpa #2, Talpa #3, Talpa #5, and/or Talpa #7.

382.   By paying themselves large salaries with huge "bonuses" and "overtime" pay (collectively the "**Insider Excess Pay**"), the Individual Defendants

appropriated for themselves profits to which Plaintiff Hilario and Plaintiff Nicolas were rightfully entitled.

### **Fake Employees**

383.  Beyond putting themselves on payroll, the Individual Defendants have people on the payroll of various Talpa Entities are not in fact employees.

384.  For example, in 2019, Kelly Rosana Zuluaga received a $48,000 "bonus" from Talpa #7.

385.  Kelly Rosana Zuluaga is married to Defendant David. Kelly Rosana Zuluaga is not, and has never been, employed by Talpa #7.

386.  Similarly, the Warehouse Entity books and records show Plaintiff Nicolas as an employee to whom wages were supposedly paid starting in spring of 2021.

387.  Plaintiff Nicolas has never been an employee of the Warehouse Entity or any of the Talpa Entities.

388.  None of the Talpa Entities ever issued a paycheck or a form W-2 to Plaintiff Nicolas.

389.  Upon information and belief, one or more of the Individual Defendants misappropriated the "wages" reflected on the records of various Talpa Entities for themselves rather than paying the money to the purported "employee" listed in the records.

**The PPP Fraud**

390.  One reason for having all of its owners and fake employees on payroll with inflated payroll numbers was for the Individual Defendants to maximize the amounts they could receive from the United States government from the Paycheck Protection Program (the "**PPP Program**").

391.  Upon information and belief, Talpa Entities received approximately $3 million in aggregate funding from the PPP Program (the "**PPP Proceeds**"), which was ultimately forgiven and turned into a grant.

392.  None of the Plaintiffs played any part in, nor had control over, obtaining or distributing any of the PPP Proceeds.

393.  Despite the fact that the Talpa Enterprise's employees were supposedly employed by the Staffing Companies, the PPP Proceeds actually went to the Operating Entities, among other Talpa Entities.

394.  Upon information and belief, the Individual Defendants conspired to alter the books and records of certain Talpa Entities to show that those entities were in fact paying employees directly so that those entities would be eligible to receive funding from the PPP Program.

395.  Upon information and belief, the Individual Defendants caused the Talpa Enterprise employees to be shifted back and forth "on paper" between the Staffing Companies and other Talpa Entities to suit their needs.

396.  The Operating Entities' books and records show massive increases in payroll expenses from 2018 to 2019.

397.  For example, the total payroll expense for Talpa #2 for year 2018 was approximately $234,000, but the following year, the annual payroll expense for year 2019 skyrocketed to over $1.302 million.

398.  There is no logical explanation for the Talpa #2 payroll expenses to more than quintuple between 2018 and 2019.

399.  Upon information and belief, after the PPP Program was announced, the Individual Defendants altered the books and records of certain Talpa Entities to show larger payroll amounts for the few years prior (during the loan calculation lookback period) to be eligible for more in PPP Proceeds.

400.  Upon information and belief, the Individual Defendants caused certain Talpa Entities to submit fraudulent information to one or more financial institutions to participate in the PPP Program and receive the PPP Proceeds.

401.  The PPP Proceeds were distributed out to various Talpa Entities, including the Operating Entities.

402.   The Individual Defendants were careful to create the illusion that the PPP Proceeds were used to fund payroll, so they left the PPP Proceeds in the bank accounts of the Operating Entities for approximately one year, until the money was effectively "laundered," and the Individual Defendants could then claim that the PPP Proceeds went to pay payroll.

403.   For example, the usual average bank balance for each of the Operating Entities was historically approximately $100,000-150,000, but after receipt of the PPP Proceeds, the average bank balances doubled or tripled and stayed at the new higher levels for approximately one year.

404.   After the Individual Defendants provided the necessary certifications regarding the use of the PPP Proceeds and the loans under the PPP Program were forgiven circa early 2021, the Individual Defendants made large scale changes "on paper" to the employment of various individuals, shifting them to different Talpa Entities as they saw fit.

405.   After sufficient time passed to conceal the source of funds, and after the loans received from the PPP Program were forgiven, the Individual Defendants stole the PPP Proceeds from the Operating Entities and misappropriated these funds for their own purposes, to the exclusion of Plaintiff Hilario and Plaintiff Nicolas.

406.   For example, according to SBA.com, Talpa #2 received $242,100 in PPP Proceeds circa April 2020.

407.   On May 3, 2021, one or more of the Individual Defendants caused $242,000 to be transferred from the Talpa #2[5] savings account to an Ameris Bank account (ending in 7012) that is customarily used, ***not*** for paying employees' wages, but for making shareholder distributions.

408.   The Individual Defendants actively concealed where the $242,000 in PPP Proceeds went and mispresented to Plaintiff Hilario what happened to the PPP Proceeds. Specifically, Defendant Eder told Plaintiff Hilario that these PPP Proceeds were being returned to the U.S. government.

409.   When Plaintiff Hilario later noticed that $210,000 was also transferred from the Talpa #2 account in January 2022, Defendant Eder lied to Plaintiff Hilario and stated that this money would be used to pay the Talpa #2 shareholders' taxes.

---

[5]      On or about January 19, 2022, one or more of the Individual Defendants caused Talpa #2 to transfer approximately $210,000 out of the Talpa #2 bank account to this same Ameris Bank account (ending in 7012). This transfer seems to be unrelated to the PPP funds, but the purpose of the transfer has been similarly concealed and misrepresented to Plaintiff Hilario.

410.   Defendant Eder lied to Plaintiff Hilario because Talpa #2 has made an S-corporation election, meaning that Talpa #2 is treated like a partnership for tax purposes, and its taxes are paid directly by its shareholders (such as Plaintiffs).

411.   None of the Defendants paid Plaintiff Hilario's share of 2021 taxes related to Talpa #2. Instead, when Plaintiff Hilario's accountant informed him of his tax liability, he complained about the tax bill and the mismatched K-1 statement to actual profit distribution. Defendant Eder made another "distribution" to Plaintiff Hilario to satisfy the taxes and stop his questioning.

412.   The Defendants did not in fact use the PPP Proceeds to pay any taxes.

413.   Instead, among other things, the Defendants used the PPP Proceeds to launch the Meat Distributor.

414.   For example, the balance sheet for Talpa #3 shows $295,000 in "PPP income" and the balance sheet for Talpa #5 shows $312,326 in "PPP income," and those two balance sheets show "loans" to the Meat Distributor in the amounts of $165,000 and $245,000, respectively.

415.   Upon information and belief, the Individual Defendants caused the PPP Proceeds to be transferred to other Talpa Entities and to purchase assets for and on behalf of Defendants.

416. None of the Plaintiffs ever received any distributions related to any of the PPP Proceeds.

417. To the extent that obtaining the PPP Proceeds and increasing the profitability of various Talpa Entities was legitimate, the Individual Defendants deprived Plaintiff Hilario and Plaintiff Nicolas of their respective shares of those profits.

418. As a result of the misappropriation of their funds and commingling with the funds of other Talpa Entities, Plaintiff Hilario and Plaintiff Nicolas are equitable interest holders in the Meat Distributor, all other entities to which the PPP Proceeds were transferred, and all assets purchased with those funds.

## **Hilario Begins Asking Too Many Questions**

419. Circa April 2022, when Plaintiff Hilario received his form K-1 for year 2021 for Talpa #2, the form showed a line item for $9,900 in "rental" income.

420. Likewise, in April 2022, when Plaintiff Hilario received his form K-1 for year 2021 for Talpa #7, the form showed a line item for $6,040 in "rental" income.

421. Plaintiff Hilario asked Defendant Eder about this supposed rental income, and Defendant Eder offered no coherent explanation for it, other than to claim that Plaintiff Hilario had already received this income, which he had not.

422.   The same day that Plaintiff Hilario asked about the form K-1 discrepancies, the Individual Defendants increased their efforts to push him out of the Talpa Enterprise as quickly as possible.

## The Squeeze-Out

423.   Shortly thereafter, Defendant Gerardo approached Plaintiff Hilario about exchanging his interests in Talpa #5 and Talpa #7 for a greater share of the Talpa #2 equity.

424.   Defendant Gerardo offered Plaintiff Hilario no explanation as to the proposed restructuring of shares or how the restructuring of shares was to benefit the Talpa Enterprise, or Plaintiff Hilario personally, and did not provide Plaintiff Hilario any material information upon which he could make an informed decision regarding the securities exchange that Defendant Gerardo proposed.

425.   Upon information and belief, the Individual Defendants conspired to consolidate and isolate Plaintiff Hilario's ownership interests in Talpa #2 because they intended to close the Talpa #2 Store and render his equity interests practically worthless.

426.   Defendant Gerardo intends to close the Talpa #2 Store after the next 5-year lease term expires in approximately 2027.

427. Defendant David told Plaintiff Hilario to "shape-up" because Defendant Gerardo could "push him out" if he so desired. Defendant David stated to Plaintiff Hilario that it is a "good thing" Plaintiff Hilario made some real estate investments because Defendant Gerardo could "push him out of the store and then you would have nothing."

428. Defendant Gerardo told Plaintiff Hilario that if he did not want to do the equity interest exchange, then Defendant Gerardo would buy out Plaintiff Hilario from all of his interests in the Talpa Enterprise.

429. Defendant Gerardo made a "take it or leave it" offer to buy out Plaintiff Hilario's interests.

430. Defendant Gerardo gave Plaintiff Hilario an ultimatum, demanding that he either accept the transfer of all of his interests to Talpa #2 or accept the buy-out offer.

431. When Plaintiff Hilario engaged counsel to evaluate Defendant Gerardo's offer, perform due diligence, and negotiate on Plaintiff Hilario's behalf, Defendant Gerardo became very angry and refused to provide information or negotiate.

432. Around that same time, Defendant Gerardo made a vague statement to Plaintiff Nicolas that there would be unspecified "changes" happening soon,

and Defendant Gerardo instructed Plaintiff Nicolas not to say anything to Plaintiff Hilario about these "changes."

433. Defendant Gerardo similarly instructed Plaintiff Hilario not to say anything to Plaintiff Nicolas regarding the proposed ownership changes being discussed.

434. Shortly thereafter, Defendant Gerardo contacted Plaintiff Nicolas to make an offer and indicated that he wanted to "remove Plaintiff Nicolas" from ownership in the Talpa Enterprise.

435. After their discussion, Defendant Gerardo's attorneys sent a document to Plaintiff Nicolas that would have provided for him to receive significantly less than he the amounts had discussed with Plaintiff Gerardo, and that document did not mention any buyout of N&G Management.

436. Similarly, in May 2022, Defendant Gerardo presented Plaintiff Hilario with a "Contribution Agreement" drafted by Talpa attorneys (the "**Contribution Agreement**").

437. In the Contribution Agreement, Talpa attorneys acknowledged Plaintiff Hilario's interests in Talpa #2, Talpa #5, Talpa #7 and Talpas Group, LLC[6],

---

[6]    Plaintiff Hilario has never knowingly become a member of Talpas Group, LLC but this interest was presented to him in the Contribution Agreement as a necessary transfer to effectuate the proposed "restructuring."

and proposed that those interests would be transferred (contributed to) to Talpa #2 in exchange for 40% of common stock in Talpa #2.

438.   The Individual Defendants prevented the Plaintiffs from having adequate information to value Plaintiffs' equity interests, which the Individual Defendants then sought to purchase from the Plaintiffs for substantially less than their fair-market value under duress (the "**Squeeze-Out**").

439.   Defendant Gerardo, through his family, employees, and attorneys, pressured Plaintiff Hilario and Plaintiff Nicolas separately to sign the respective legal documents without any explanation of the reason for any urgency.

440.   The Plaintiffs instead engaged counsel, which then set off a deeper level of coercion and duress.

## The Freeze-Out

441.   On July 6, 2022, while still employed by Talpa #2, Plaintiff Hilario traveled to Mexico for vacation while his attorney attempted to clarify the proposed deal and its terms.

442.   Plaintiff Hilario returned from his vacation on July 24, 2022 and attempted to return to work on July 25, 2022, but he was denied entry into the Talpa #2 Store.

443. On August 1, 2022, Defendant Eder and Defendant David terminated Plaintiff Hilario's employment as store manager at Talpa #2, both verbally and through email.

444. In the termination letter sent by Defendant David, the pretext the Individual Defendants used for firing was Plaintiff Hilario's "expressed desire to exit the business."

445. Plaintiff Hilario did not express any desire to exit the business until the Defendants first tried to push him out.

446. There was no actual basis to terminate Plaintiff Hilario's employment, other than the Individual Plaintiffs' desire to push him out of the Talpa Enterprise and to place him in a position where he could not afford to hire counsel to enforce his legal rights.

447. In August 2022, after years of paying monthly profit distributions to Plaintiff Hilario and Plaintiff Nicolas, the Defendants suddenly decided to "cut them off" and stop distributions altogether.

448. The Individual Defendants are well-aware that Plaintiff Hilario and Plaintiff Nicolas are dependent on the profit distributions that they received regularly for years as a significant portion of their income.

449. The Individual Defendants are aware that Plaintiff Nicolas is disabled and unable to work.

450. The Individual Defendants are aware that Plaintiff Hilario is now unemployed since they fired him without cause.

451. When Plaintiff Nicolas' attorney asked Defendant Gerardo's attorneys why the August 2022 distribution payment had not been made, they responded with a vague statement regarding "reinvestment" of the money.

452. When Plaintiff Hilario contacted Defendant Eder regarding the missing distribution check for August 2022, Defendant Eder claimed there were "legal issues" among the shareholders that there would be no distributions to any shareholder until those issues were resolved, and that Plaintiff Hilario should go talk to his lawyer.

453. In other words, the Individual Defendants intended to "starve out" the Plaintiffs through litigation—by forcing the Plaintiffs to file this lawsuit and forcing them to incur significant legal fees.

454. The Individual Defendants' collective action of cutting off distributions to the Plaintiffs and refusing to provide information related to their investments (the "**Freeze-Out**") has been, and is being done, in a calculated effort by the Individual Defendants to deprive Plaintiffs of their rights.

## The Defendants' Threats

455.   Pursuant to Talpa #2's shareholders agreement, upon Plaintiff Hilario's termination as an employee of Talpa #2, Defendant Gerardo is required to purchase all shares in Talpa #2 from Plaintiff Hilario at a price based upon the most recent valuation of the total shares. There has never been a valuation of the Talpa #2 shares as required under the shareholders agreement.

456.   Relying on an unenforceable provision of the shareholder's agreement for Talpa #2, Defendant Gerardo's attorneys communicated via email that Defendant Gerardo could unilaterally value the companies and Plaintiff Hilario's shares.

457.   When Plaintiff Hilario engaged counsel to review the Contribution Agreement, Defendant Gerardo's attorney refused to provide information to allow Plaintiff Hilario to make an informed decision, forcing him to reject the offer.

458.   Plaintiff Hilario made a good-faith valuation of each entity based on his knowledge of the profitability of each, but that offer was rejected. Defendant Gerardo's attorneys instead made an offer to purchase Plaintiff Hilario's interests in Talpa #2 and Talpa #7, but they made no mention of Talpa #5, despite the fact that their own documents reflected his interest in the entity.

459. When the proof of Plaintiff Hilario's contribution payments for Talpa #5 was sent to Defendant Gerardo's attorneys, they confirmed that he was, in fact, a shareholder in Talpa #5, a fact reflected in the K-1 statements Plaintiff Hilario received for Talpa #5 since 2020.

460. Defendant Gerardo made it clear to Plaintiff Hilario that if Plaintiff Hilario did not accept Defendant Gerardo's "take it or leave it" offer and sought to enforce his legal rights, Defendant Gerardo would use his financial resources and the resources of the Talpa Enterprise to crush Plaintiff Hilario.

461. Defendant Gerardo told Plaintiff Hilario: "I'm going to throw money at the lawyers and it's going to be a battle of the bags. Your bag versus the bags of the companies."

462. On June 13, 2022, Plaintiff Nicolas called Defendant Eder to inquire about the fact that the offer received from Defendant Gerardo's attorneys for the purchase of his equity interests was lower than what they had discussed.

463. Defendant Eder promised Plaintiff Nicolas that he would "get the money" to make up the difference.

464. Several days later, Defendant Gerardo called Plaintiff Nicolas in a rage, screaming (in a voice so loud that other witnesses could hear him on the other

end of the line) that "if I want to steal from you, I can get you out of the business and remove you from the [Talpa #5] Shopping Center!"

465. Defendant Nicolas's attorney emailed Defendant Gerardo's attorneys requesting documentation for Talpa #3 and Talpa #5. In response, Defendant Gerardo's attorneys sent a purported shareholder agreement that had no reference to Plaintiff Hilario's interest, even though the same attorneys drafted Plaintiff Hilario's Contribution Agreement and acknowledged his interest in Talpa #5.

466. On September 19, 2022, Defendant Gerardo's attorney emailed both Plaintiffs' counsel separately and rescinded the offers to buy them out without any explanation for why the offers were being withdrawn.

467. Defendant Gerardo's attorney also indicated that Defendant Gerardo intended to unilaterally sell N&G Management and/or the Talpa #5 Shopping Center and intended to engage a broker for that purpose.

468. Plaintiff Nicolas' attorney responded by reserving his client's rights to approve any such sale and asked to participate in the process.

469. Defendant Gerardo's attorney responded that Defendant Gerardo had no intention of involving Plaintiff Nicolas in the process and claimed that

Defendant Gerardo had unfettered rights to do anything he wants with the assets of N&G Management.

470. The Operating Agreement for N&G Management provides that a sale of substantially all of the assets of the company requires approval of a majority of the members.

471. Any unilateral sale of the Talpa #5 Shopping Center or any transfer of Plaintiff Nicolas' interests in Talpa #3, Talpa #5, or N&G Management without approval of any of the Delgado Plaintiffs is unauthorized, fraudulent, and void.

472. Any transfer of Plaintiff Hilario's interests in Talpa #2, Talpa #5, Talpa #7, Talpas Group, LLC, or the Trucking Company is unauthorized, fraudulent, and void.

## CLAIMS FOR RELIEF

### COUNT I: FEDERAL CIVIL RACKETEERING
### 18 U.S.C. §§ 1962(c) & 1964(a)
### Against All Defendants

473. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

474.   Pursuant to 18 U.S.C. § 1961(4), the Talpa Enterprise is an association of individuals, partnerships, corporations, associations, and/or other legal entities that are engaged in, and whose activities affect, interstate commerce.

475.   Pursuant to 18 U.S.C. § 1961(3), the Count I Defendants are persons capable of holding beneficial interest in property.

476.   The Count I Defendants are employed by or associated with the enterprise.

477.   The Count I Defendants agreed to and did conduct and participate, both directly and indirectly, in the conduct of the Talpa Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

478.   Specifically, the Defendants conducted strawman purchasing schemes, falsified and forged company records, created numerous and disparate shell companies to hide assets, misrepresented the financial records of the Talpa Entities, fraudulently commingled and wired monies from Talpa Entities to the other Operating Entities, Holding Entities, Other Entities, and Staffing Companies, and conspired to oust Plaintiffs from the Talpa Entities in which they had ownership.

479.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related predicate acts of racketeering prohibited under 18 U.S.C. § 1961(1)(B) & (1)(F), including specifically:

a. Fraud and related activity in connection with identification documents (18 U.S.C. § 1028 (a));

b. Mail fraud (18 U.S.C. § 1341);

c. Wire fraud (18 U.S.C. § 1343);

d. Bank fraud (18 U.S.C. § 1344); and

e. Promotional and concealment money laundering (18 U.S.C. §§ 1956(a) & 1957(a)).

480.   The acts of fraud and related activity in connection with identification documents, mail fraud, wire fraud, bank fraud, and money laundering set forth in paragraph 482 constitute a pattern of racketeering activity. 18 U.S.C. § 1961(5).

481.   Defendants have directly and indirectly conducted and participated in the conduct of the Talpa Enterprise's affairs through the pattern of racketeering activity described in paragraphs 482 and 483, in violation of 18 U.S.C. § 1962(c).

482. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property, without limitation, in the following ways:

a. Their money has been unlawfully converted by Defendants;

b. Their profits have been siphoned off and rolled into other properties and entities owned and/or controlled by Defendants without their knowledge or consent;

c. Their interests in the various Talpa Entities that they invested in have been diluted to their detriment;

d. The entities that the Plaintiffs were coerced into forming have been controlled and converted to Defendants' use while Defendants continue to utilize Plaintiffs' identities and creditworthiness; and

e. Defendants have exposed Plaintiffs to possible criminal or civil liability for tax evasion and PPP fraud by association with Defendants in common ownership of the Plaintiff-Owned Entities.

483. As a result of the criminal racketeering enterprise formed by the Defendants, Plaintiffs have been injured in their business and property in an amount to be proven at trial, including treble damages, punitive damages, and attorney's fees and costs.

## COUNT II: FEDERAL CIVIL RACKETEERING
## 18 U.S.C. §§ 1962(a) & 1964(d)
### Against All Defendants

484. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

485. Pursuant to 18 U.S.C. § 1961(4), the Talpa Enterprise is an association of individuals, partnerships, corporations, associations, and/or other legal entities who have engaged in, and whose activities affect, interstate commerce.

486. Pursuant to 18 U.S.C. § 1961(3), the Count II Defendants are persons capable of holding beneficial interest in property.

487. The Defendants are employed by or associated with the enterprise.

488. The Defendants have unlawfully received income derived both directly and indirectly from the Talpa Enterprise's pattern of racketeering activity.

489. The Defendants used and invested this racketeering income, as further described above, in the Talpa Enterprise's interstate commerce activity. Specifically, Defendants consistently over a period of years falsified corporate records, tax documents, and employee rosters to misrepresent the profitability of Talpa #2, Talpa #3, Talpa #5, and Talpa #7 to Plaintiffs. Defendants converted Plaintiffs' lawful profits to their own use for investment into new

entities, personal homes, vehicles, and commercial real estate utilizing strawman purchases, wire and mail fraud, laundering of fraud proceeds, and fraudulent use of SBA loans and the PPP Proceeds.

490. The fraud and money laundering schemes, including specifically but not limited to the Insider Excess Pay, the Trucking Company Under-Compensation, the Shopping Center Cash-Out, Roll-Up and Roll-Over, the Misappropriated Distributions, the Cash Embezzlement, the Staffing Company Overpayments, the Warehouse Overpayments, and the Meat Distributor Overpayments, together with the fraudulent use of SBA loans and the PPP Proceeds (collectively "**Cash Siphoning Schemes**"), constitute a pattern of racketeering activity with a purpose of generating income for the Count II defendants.18 U.S.C. § 1961(5).

491. As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a) in deriving direct and indirect income from their **Cash Siphoning Schemes**, Plaintiffs have been injured in their business and property in that Plaintiffs' monies have been used to purchase assets that they do not have legal title in, resulting in a constructive trust over those assets, which are subject to disgorgement.

492.   As a result of the **Cash Siphoning Schemes**, Plaintiffs have been injured in their business and property in an amount to be proven at trial, including treble damages, punitive damages, and attorney's fees and costs.

## COUNT III: FEDERAL CIVIL RACKETEERING
### 18 U.S.C. §§ 1962(b) & 1964(d)
### Against all Defendants

493.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

494.   Pursuant to 18 U.S.C. § 1961(4), the Talpa Enterprise is an association of individuals, partnerships, corporations, associations, and/or other legal entities who have engaged in, and whose activities affect, interstate commerce.

495.   Pursuant to 18 U.S.C. § 1961(3), Defendants are persons capable of holding beneficial interest in property.

496.   The Defendants are employed by or associated with the Talpa Enterprise.

497.   The Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity, including without limitation the following acts:

a. Falsifying company records for Talpa #2, Talpa #3, Talpa #5, and Talpa #7;

b. Committing tax fraud against the State of Georgia, State of Tennessee, and United States government; and

c. Committing bank fraud by falsifying loan applications and fraudulently using the Plaintiffs' identities to secure funding for the creation of new entities and purchase of real estate.

498. The tax and bank fraud listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

499. Defendants have directly and indirectly acquired and maintained interests in, and control of, the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

500. As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property in that:

a. their minority interests in the Talpa Entities have been diluted through the **Cash Siphoning Schemes**, unapproved debt transactions, and tax evasion;

b. their profits have been siphoned off for the benefit of Defendants and to Plaintiffs' detriment; and

c. Defendants have subjected Plaintiffs to potential criminal and civil penalties through the criminal activity of Defendants.

501. As a result of the Defendants' control over and interest in the Plaintiff-Owned entities during their criminal conspiracy, Plaintiffs have been injured in their business and property in an amount to be proven at trial, including treble damages, punitive damages, and attorney's fees and costs.

### COUNT IV: CONSPIRACY TO COMMIT RACKETEERING
### 18 U.S.C. § 1962(d)
### Against the Individual Defendants

502. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

503. As set forth in Counts I, II, and III, the Individual Defendants agreed and conspired to violate 18 U.S.C. § 1962 (a), (b), and (c) by committing (without limitation) the following overt acts:

a. Conspiring to and actually siphoning Plaintiffs' profits using falsified corporate records, tax documents, and employee rosters to misrepresent the profitability of the Plaintiff-Owned Entities;

b. Conspiring to and actually converting Plaintiffs' profits for their own use through Cash Siphoning Schemes;

c. Conspiring to and actually converting Plaintiffs' lawful profits to their own use for investment into new entities, personal homes, vehicles, and

commercial real estate utilizing strawman purchases, wire and mail fraud, and fraudulent use of SBA loans and PPP funds;

d. Conspiring to and actually acquiring and maintaining interests in and control of the enterprise by falsifying loan applications and fraudulently using the Plaintiffs' identities to secure funding for the creation of new entities and purchase of real estate; and

e. Conspiring to and actually committing acts of fraud and related activity in connection with identification documents, fraud and related activity in connection with access devices, mail fraud, wire fraud, and financial institution fraud.

504. The Individual Defendants intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.

505. The Individual Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described by Counts I, II, and II above. That conduct constitutes

a conspiracy to violate 18 U.S.C. §§ 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

506. As direct and proximate result of the Count IV Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that the Individual Defendants conspired to divert profits from the Plaintiff-Owned Entities for their own personal use and that of the other disparate Talpa Entities in which the Plaintiffs do not hold a legal interest.

507. Plaintiffs' property and assets were commingled by the Individual Defendants into the Talpa Enterprise through a series of sophisticated schemes, including without limitation, the **Cash Siphoning Schemes**.

508. As a result of the Defendants' conspiracy, Plaintiffs have been injured in their business and property in an amount to be proven at trial, including treble damages, punitive damages, and attorney's fees and costs.

### COUNT V: GEORGIA CIVIL RACKETEERING
### O.C.G.A. § 16-14-1, *et seq*.
### Against All Defendants

509. The Plaintiffs restate and incorporate by reference the foregoing paragraphs of this Complaint, as though the same were fully set forth herein.

510.   Pursuant to O.C.G.A. § 16-14-3(3), the Talpa Enterprise is a group of persons, partnerships, corporations, business trusts, and/or other legal entities associated in fact, and Defendants are persons employed by, or associated with, the enterprise.

511.   Pursuant to O.C.G.A. § 16-14-3(4) and (5), Defendants have engaged in at least two non-isolated acts of racketeering activity with similar intent, accomplices, and victims, in furtherance of their scheme to deceive and defraud Plaintiffs.

512.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related predicate acts of racketeering, including but not limited to:

a. Violation of the Georgia Uniform Securities Act of 2008 (O.C.G.A. § 16-14-3(5)(A)(iii);

b. Theft by deception (O.C.G.A. § 16-14-3(5)(A)(xii);

c. Theft by receiving (O.C.G.A. § 16-14-3(5)(A)(xii);

d. Forgery (O.C.G.A. § 16-14-3(5)(A)(xvi));

e. Identity fraud (O.C.G.A. § 16-14-3(5)(A)(xx); and

f. Felonies involving certificates of title and security interests or liens O.C.G.A. § 16-14-3(5)(A)(xxxix) & O.C.G.A. § 16-14-3(5)(B)).

513. Defendants obtained property by deceitful means and artful practice with the intention of depriving Plaintiffs of their lawful profits in the Plaintiff-Owned Entities.

514. Defendants received Plaintiffs' stolen and converted property when they misdirected lawful profits from the Plaintiff-Owned Entities to other entities that they knew or should have known was stolen. Defendants had no intention of retuning these ill-gotten gains to Plaintiffs, which is why they conspired to conceal the target Ameris account and lied to Plaintiffs about what the transferred monies were being used for.

515. Defendants forged and/or conspired to forge Plaintiff Nicolas's signature to documents that purportedly gave 80% of the equity in N&G Management to Defendant Gerardo and only 20% of the equity interests to Plaintiff Nicolas.

516. Defendants made false statements and/or conspired to make false statements when obtaining mortgage loans for the various real property interests purchased with ill-gotten gains or through coercive and deceptive inducement of Plaintiffs to sign documents permitting carte-blanche rights to encumber Plaintiffs' property.

517. Defendants represented to Plaintiffs that they would participate in, and benefit from, profits and other revenue generated by the Talpa Enterprise.

518.  However, Defendants, through methods of artful device and deception, conspired with each other to procure Plaintiffs' money and property, and to systematically exclude them from such participation.

519.  As a result of Defendants' pattern of deceit and fraudulent activity, Plaintiffs surrendered money and were deprived of valuable property that they would not have otherwise surrendered or lost.

520.  Defendants made promises related to the transfer of Plaintiffs' valuable money, services, and property that were false and were made for the purpose of deceiving Plaintiffs into surrendering money, services, and property, and depriving them of same, including without limitation, the statements and actions Defendants have made to and committed against Plaintiffs as detailed above.

521.  Defendants, in conspiracy with each other, intentionally misrepresented to Plaintiffs their then-intentions regarding Plaintiffs' role in the Talpa Enterprise, which furthered Defendants' scheme to deceive Plaintiffs into surrendering the subject money, services, and property to Defendants.

522.  Defendants presented Plaintiff Hilario with the Contribution Agreement to exchange his interest in Talpa #2, #5, #7, and the Talpas Group, LLC for a

larger interest in Talpa #2 without any notice, meeting, or vote to indicate the purpose of such a transaction.

523. Defendants lied to Plaintiff Hilario about his contribution payments made to Talpa #5 and deceitfully hid his buy-in to Talpa #5 from Plaintiff Nicolas.

524. Defendants fraudulently induced Plaintiff Hilario into contributing cash for 10% in Talpa #7 but never provided him with copies of the documents he signed that evidenced his interest.

525. Defendants fraudulently conducted the Cash-Out, Roll-Up and Roll-Over scheme using equity proceeds extracted from N&G Management's real property without the Delgado Plaintiffs' knowledge or consent.

526. Defendants caused the wire from the closing law firm to be used to transfer N&G Management's cashed-out equity to Defendant Gerardo personally so he could buy his personal residence, 2411 Lockerly Pass.

527. Defendants obtained PPP Proceeds without Plaintiffs' knowledge or approval.

528. Defendants used PPP Proceeds to siphon ill-gotten profits for their own exclusive use.

529. Defendants caused the wires from the Talpa #2, Talpa #3, Talpa #5, and Talpa #7 accounts to be fraudulently transferred to the Ameris account without any notice or explanation to Plaintiffs.

530. Defendants have used threats of financial crimes to try to coerce Plaintiffs into accepting their criminal activity and have systematically presented the profits being paid to Plaintiffs as "gifts" that could be withheld at any time despite that Plaintiffs bargained and paid for those interests.

531. Defendants used Plaintiffs' impressions of existing facts related to their interest in the various Talpa Entities which were false and which Defendants knew or believed to be false to commingle monies between the various Talpa Entities.

532. Defendants obtained personal property from Plaintiffs by falsely representing to Plaintiffs that they would participate in, and benefit from, the Talpa Enterprise when in fact they knew that at the time of the representations that they had already decided to exclude Plaintiffs from their criminally derived profits, facilitating the drafting of fraudulent documents.

533. Defendants obtained (and continue to obtain) personal property, including money, rental income, and revenue from Talpa Enterprise to the exclusion of Plaintiffs by misrepresenting their intentions as to Plaintiffs' participation in the Talpa Enterprise.

534. Defendants failed to correct false impressions of existing facts that Plaintiffs were relying on so that they could continue to obtain valuable property from

Plaintiffs and expand the Talpa Enterprise to further their criminally-derived profits and other benefits to Plaintiffs' detriment.

535.   This unlawful and fraudulent conduct resulted in pecuniary gain to each of the Defendants and operated to the financial detriment of Plaintiffs.

536.   The Plaintiffs have been injured by the Defendants' criminal conspiracy in an amount to proven at trial.

## COUNT VI: DECLARATORY JUDGMENT
## ALTER EGO/COMMON ENTERPRISE
### Georgia Common Law
### Against the Talpa Entities

537.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

538.   The Talpa Entities comprising the Talpa Enterprise are an interdependent family of companies under common control by the Individual Defendants.

539.   The Individual Defendants have failed to observe corporate formalities with respect to the Talpa Entities by failing to, among other things, keep proper records, elect boards of directors, hold shareholder meetings, and provide basic notices to shareholders.

540. Upon information and belief, the Individual Defendants shifted money back and forth between the Talpa Entities, and commingled funds among them, several acting as mere conduits for one another.

541. Upon information and belief, funds have been commingled among various Talpa Entities due to transfers between and among them.

542. Upon information and belief, one or more of the Individual Defendants maintains a "booking account" to which profits from the various Talpa Entities are transferred.

543. The Individual Defendants routinely commingle funds of the various Talpa Entities comprising the Talpa Enterprise and shift funds back and forth among them.

544. Accordingly, many—if not all—of the entities in the Talpa Enterprise are holding funds that rightfully belong to the Plaintiffs.

545. The Individual Defendants over-extended their privileges in the use of corporate entities, the construction of which was a sham used by the Defendants to defeat justice, perpetuate fraud, and to evade contractual and tort responsibility to the Plaintiffs.

546. Accordingly, Plaintiffs are entitled to a declaratory judgment that the various Talpa Entities comprising the Talpa Enterprise are alter egos of one another

whose alleged corporate separateness should be disregarded based on equitable principles, and the Plaintiff's ownership interests and claims are to the Talpa Enterprise as a whole.

## COUNT VII: DECLARATORY JUDGMENT REGARDING CORPORATE RIGHTS
### O.C.G.A. § 9-4-2, *et seq.*
### Against All Defendants

547. The Plaintiffs reallege and incorporates allegations contained in the foregoing paragraphs as if each were set forth herein verbatim.

548. There is an actual controversy between the parties because the profits of the Plaintiff-Owned Entities in have been redirected to other entities and assets in which the Plaintiffs do not hold legal interests, and the Individual Defendants have made secret changes to the ownership structure of various Talpa Entities, making the legal and equitable interests of the Plaintiffs complex and uncertain.

549. The parties are in a position of uncertainty regarding the transfers made to the Operating Entities, the Holding Entities, the Other Entities, and the Staffing Companies (the Talpa Entities) that were the lawful profits and property of the Plaintiffs and the extent to which those transfers entitle the Plaintiffs an

equitable interest in many or all of the Talpa Entities and other assets purchased with the Defendants' ill-gotten gains.

550. The true and current value of Plaintiffs' entitlement to profit distributions and shareholder or membership interests in the Talpa Entities are material to this action.

551. An actual or justiciable controversy exists between the parties in this case concerning the rights of the Plaintiffs under the operating agreements and shareholder agreements (if applicable) of the Plaintiff-Owned Entities and applicable law.

552. For example, Defendant Gerardo has taken the position that he can make such unilateral decisions regarding valuation of share prices and a sale of substantially all of the assets of N&G Management, and the Plaintiffs strongly disagree regarding his ability to do so.

553. Defendant Gerardo has also taken the position that he can make such unilateral decisions regarding the valuations and restructuring of Talpa #2, Talpa #5, and Talpa #7 without any notices, meetings, or votes and force Plaintiff Hilario to accept the unilateral valuations and restructuring plan or else get into a battle of the money "bags."

554.   Plaintiffs are without an adequate remedy at law and have exhausted all attempts to negotiate with the Defendants toward a resolution on this matter.

555.   Plaintiffs request that the Court issue a decree freezing the Defendants' assets to prevent further loss to Plaintiffs.

556.   Plaintiffs request that the Court issue a decree that they are entitled to receive the books and records of all Talpa Entities from 2016 through and including the date of the final trial on this matter.

557.   The Plaintiffs further request that the Court issue a decree that the various real properties being held by the Defendants are subject to legal and equitable claims and may not be sold absent consent by the Plaintiffs or further order of the Court.

558.   The Plaintiffs request that the Court issue a decree that any unilateral valuations proffered by Defendant Gerardo for the Plaintiff-Owned Entities are null and void and of no legal consequence.

559.    The Plaintiffs request that the Court issue a decree that any valuation proposed by Defendants attempting to value Plaintiffs' interests be null and void.

## COUNT VIII: CONVERSION
## O.C.G.A. § 51-10-1
### Against all Defendants

560.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

561.   The Plaintiffs are legally entitled to profit distributions from the Plaintiff-Owned Entities and hold an interest in the assets thereof by virtue of their ownership of equity interests therein.

562.   The Individual Defendants, through a scheme of diverting profits of the Plaintiff-Owned Entities away from the Plaintiffs and to the Individual Defendants and various other Talpa Entities in which the Plaintiffs do not have a legal interest, have converted monies or owing to the Plaintiffs over the course of the existence of the Talpa Enterprise.

563.   The Defendants have misappropriated and permanently converted monies belonging or owing to the Plaintiffs to their own personal use and benefit.

564.   There are many instances of the Individual Defendants employing various schemes to convert profit distributions owing to the Plaintiffs for their own use and the use of Talpa Entities they own and control, including without limitation, the Cash Siphoning Schemes.

565.   The Defendants continue to exert dominion and control over funds rightfully belonging to the Plaintiffs.

566.   The Plaintiffs have demanded payment of these funds and profits due to them, but Defendants have refused to relinquish control over and return possession of the funds to the Plaintiffs in an effort to "starve them out."

567.   As such, the Plaintiffs have been permanently deprived of their money, services, and property, and have incurred damages in an amount to be proven at trial.

## COUNT IX: FRAUD
## O.C.G.A. § 51-6-1, *et seq*.
## Against the Individual Defendants

568.    The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

569.   The Individual Defendants made many misrepresentations (and material omissions) over the years to the Plaintiffs regarding the Plaintiffs' investments in various Talpa Entities in order to deceive the Plaintiffs into making those investments to prevent them from being aware of their legal rights related to those investments.

570.   Defendant Gerardo's misrepresentations include without limitation the Shopping Center Bait-and-Switch; his promises to Plaintiff Nicolas to

continue making profit distributions to provide for his retirement; his promises to Plaintiff Hilario of equity in certain Talpa Entities to induce Plaintiff Hilario to invest his efforts and money in the Talpa Enterprise; his misrepresentations to Plaintiff Nicolas and Plaintiff Hilario regarding the contents and legal effects of certain documents he presented for them to sign, which he knew they could not read and understand; his misrepresentations regarding the holders of equity interests in certain Talpa Entities; and his misrepresentations regarding the use of funds of the Plaintiff-Owned Entities.

571. Defendant Eder's misrepresentations include without limitation his lies to Defendant Hilario regarding the misappropriation of funds that should have been distributed as profits and which were instead redirected to the Individual Defendants and/or other Talpa Entities.

572. Defendant David's misrepresentations include without limitation his statements to Plaintiff Hilario that Defendant Gerardo could force Plaintiff Hilario out of the Talpa Enterprise, which were designed to try to coerce Plaintiff Hilario into not enforcing his legal rights and "selling cheap" his equity interests.

573. Defendant Denisse's misrepresentations include without limitation statements made in and in connection with legal documents that she prepared and presented to the Plaintiffs for signature.

574. The Individual Defendants made numerous material omissions over the years, concealing as much information as possible regarding the ownership and profitability of various Talpa Entities and the Plaintiffs' legal rights as equity owners.

575. The Individual Defendants knew their misrepresentations and material omissions were false and designed to conceal the truth at the time they made those misrepresentations (or concealed material facts).

576. At all relevant times, the Plaintiffs were lacking sufficient knowledge to be aware that the representations of the Individual Defendants were false.

577. The Individual Defendants made the misrepresentations and material omissions with the intention and purpose of deceiving the Plaintiffs regarding the nature and extent of the Plaintiffs' legal rights to profit distributions and otherwise.

578. The Plaintiffs reasonably and justifiably relied on the representations of the Individual Defendants.

579. The Individual Defendants have taken actions in furtherance of their fraud, such as shutting Plaintiffs out of the Talpa Entities, depriving Plaintiffs of rents, salary, and distributions, refusing to allow Plaintiffs to inspect the records and books of the Talpa Entities, demanding that Plaintiffs accept buyout terms without performing any due diligence or good faith negotiations for value.

580. The Plaintiffs have sustained significant damages (and continue to sustain damages) as the proximate result of the Individual Defendants' misrepresentations and material omissions, in an amount to be proven at trial.

## COUNT X: CONSPIRACY TO COMMIT FRAUD
### Georgia Common Law
### Against the Individual Defendants

581. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

582. Each of the Individual Defendants was aware that other Individual Defendants had made misrepresentations (and material omissions) to the Plaintiffs regarding their investments in the Talpa Enterprise and rights related thereto.

583. Each of the Individual Defendants explicitly or implicitly approved of and encouraged misrepresentations (and material omissions) made by other Individual Defendants to the Plaintiffs.

584. The Individual Defendants agreed to work together and participated in a conspiracy to defraud the Plaintiffs.

585. The Plaintiffs have been damaged (and continue to be damaged) by the Individual Defendants' conspiracy to defraud them in an amount to be proven at trial.

## COUNT XI: BREACH OF FIDUCIARY DUTIES
### O.C.G.A. § 14-2-101, *et seq.*

### Against the Individual Defendants

586.  The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

587. The Individual Defendants were and are officers of the Talpa Enterprise and the Plaintiff-Owned Entities.

588. Inherent in and arising from the of status of the Individual Defendants as officers of the Talpa Entities are fiduciary duties of care, loyalty, integrity, candor, and good faith to the Talpa Entities and their equity holders.

589. The Individual Defendants owe Plaintiffs a continuing fiduciary duty and are otherwise obligated to act with the highest degree of fidelity, good faith, and candor towards Plaintiffs.

590.   Defendant Gerardo, as majority equity owner of most or all of the Plaintiff-Owned Entities, has fiduciary duties to the Plaintiffs as minority owners.

591.   The Individual Defendants have taken many actions over the years in violation of their fiduciary duties to the Plaintiffs (and continue to take such actions), including without limitation, the Shopping Center Cash-Out, Roll-Up and Roll-Over, the Cash Siphoning Schemes, the Freeze-Out, and the Squeeze-Out, concealing the shifting ownership structure of various Talpa Entities, withholding and refusing to produce material information related to the financial performance of the Talpa Entities and Plaintiffs' equity interests and rights to profit distributions, failing to coordinate on valuation of equity and membership shares, and/or taking or threatening to take actions that the Individual Defendants are not legally entitled to take with respect to certain Talpa Entities and the Plaintiffs' equity interests therein.

592.   The Individual Defendants have refused to account for monies and property, and when their schemes began to be uncovered, they terminated Plaintiff Hilario from his employment with Talpa without cause in a blatant attempt to conceal their malfeasance and deprive Plaintiff Hilario and the Delgado Plaintiffs of their legal rights.

593. The Individual Defendants have repeatedly violated (and continue to violate) their fiduciary duties of care, loyalty, integrity, candor, and good faith to the Plaintiffs.

594. As a direct and proximate result of the Individual Defendants' violations of their fiduciary duties, the Plaintiffs have sustained significant damages, and as a result of the misconduct alleged herein, the Individual Defendants are liable to Plaintiffs in amount to be proven at trial.

## COUNT XII: CONSPIRACY TO INDUCE BREACH OF FIDUCIARY DUTIES
### Georgia Common Law
### Against the Individual Defendants

595. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

596. Each of the Individual Defendants was aware that other Individual Defendants was taking actions in violation of their fiduciary duties to the Plaintiffs as equity owners of various Talpa Entities.

597. Each of the Individual Defendants explicitly or implicitly approved of and encouraged the breach by other Individual Defendants of their duties to the Plaintiffs.

598. The Individual Defendants agreed to work together and participated in a conspiracy to breach their fiduciary duties to the Plaintiffs.

599. The Plaintiffs have been damaged (and continue to be damaged) by the Individual Defendants' conspiracy to breach their fiduciary duties to the Plaintiffs in an amount to be proven at trial.

## COUNT XIII: INJUNCTION
### Federal and State Statutes and Common Law
### Against All Defendants

600.  The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

601. The Plaintiffs seek a preliminary injunction to preserve the status quo pending adjudication of their rights.

602. The Plaintiffs will suffer immediate and irreparable harm if the Defendants are allowed to continue misusing and misappropriating the Plaintiffs' assets.

603. The Plaintiffs further intend to seek an interlocutory and permanent injunction thereafter in accordance with the Plaintiffs' rights.

604. The Plaintiffs show they are entitled to a preliminary injunction, preventing the Defendants from engaging in the following activities pending adjudication of the Plaintiffs' rights:

a. Distributing any profits to any equity holder in any of the Talpa Entities;

b. Paying any overtime, bonuses, or other compensation in excess of a reasonable salary to any of the Individual Defendants or any of their relatives;

c. Using any funds of any of the Talpa Entities to pay any attorneys for representation any of the Individual Defendants;

d. Selling or transferring any property outside the ordinary course of business (or their ordinary household affairs);

e. Submitting any applications for any loan to any financial institution on behalf of any of the Talpa Entities;

f. Pledging any assets or equity of any of the Talpa Entities as collateral to any party;

g. Selling or transferring any equity interest in any Talpa Entity;

h. Taking any action with respect to any of the Plaintiff-Owned Entities outside the ordinary course of business without the consent of the Plaintiffs;

i. Refusing to produce books and records of the Talpa Entities; or

j. Transferring any funds out of the United States.

605. If the Defendants are allowed to continue engaging in the foregoing activities, Plaintiffs will be irreparably injured.

606.   To the extent the Defendants have engaged in any of the foregoing activities within 90 days prior to the filing of this Complaint, the Plaintiffs request that any such activities or transfers be voided and reversed.

607.   The Defendants, through their long history of concealing profitability, hiding assets, misappropriating profits, overpaying the Individual Defendants, commingling funds between disparate Talpa Entities, paying attorneys to aid them in their efforts to deprive the Plaintiffs of their rights, selling and transferring property without the Plaintiffs' knowledge or consent, secretly applying for loans and encumbering assets, defrauding banks and various governmental entities, secretly selling and transferring equity interests in various Talpa Entities, refusing to even request the Plaintiffs' consent to major transactions, hiding assets, and orchestrating the Freeze-Out and the Squeeze-Out, have demonstrated that they will continue to flaunt and violate the Plaintiffs' rights if not enjoined from doing so.

608.   The Plaintiffs will sustain imminent and irreparable injury absent a preliminary injunction.

609.   There is a substantial likelihood that the Plaintiffs will prevail on the merits of their claims because the evidence obtained without the benefit of discovery has already demonstrative that the Defendants have engaged in racketeering,

converted the Plaintiffs' property, defrauded them, breached fiduciary duties to them, have conspired to do so for years, and they have refused to cease engaging in their unlawful activities.

610. The injury Plaintiffs will sustain absent a preliminary injunction outweighs the possible injury the Defendants could sustain if a preliminary injunction is not granted.

611. The granting of the relief sought herein would serve the public interest because it would discourage parties in control of businesses to use the resources of those businesses as a sword to deprive minority owners of those businesses of their legal rights.

612. The Plaintiffs have no adequate remedy at law.

613. The Plaintiffs request a permanent injunction of the foregoing activities until such time that they have been fully compensated for all damages awarded to them at trial in this case.

## COUNT XIV: CONSTRUCTIVE TRUST
### O.C.G.A. § 53-12-132
### Against all Defendants

614. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

615.   The Plaintiffs are entitled to impose a constructive trust on all past and future profits of the Talpa Enterprise as well as all assets purchased or improved with ill-gotten gains from the Defendants' fraudulent schemes.

616.   A constructive trust arises with respect to the title to property, which was acquired by fraud or other unlawful means, including the predicate acts stated above.

617.   The Plaintiffs cannot enjoy the beneficial interest in their profits due to the Defendants' fraudulent schemes that violate the established principles of equity.

618.   Through their fraudulent schemes, the Defendants have commingled the profits and assets belonging to Plaintiffs into the Talpa Enterprise without Plaintiffs' knowledge or permission and have used those funds to purchase personal assets for themselves.

619.   For example, within weeks of receiving the funds from the Shopping Center Cash-Out, Defendant Gerardo not only orchestrated the Roll-Up and the Roll-Over, but he used funds belonging to the Delgado Plaintiffs to purchase 2411 Lockerly Pass, among other things.

620.   As a further example, the Individual Defendants caused funds rightfully owned by Plaintiff Nicolas and Plaintiff Hilario to be used to fund the start-up of the Meat Distributor and to be intermingled with the funds of that entity.

621.   Over the years, the Defendants have transferred and intermingled the property of the Plaintiffs across the Talpa Enterprise and throughout the various Talpa Entities.

622.   Because the Plaintiffs' funds were improperly transferred to other Talpa Entities and commingled amongst them, the Plaintiffs hold equitable interests in all of the Talpa Entities, all of their assets, and the entire Talpa Enterprise.

623.   Pursuant to O.C.G.A. § 53-12-90, the Plaintiffs are entitled to a constructive trust over the assets of (without limitation) all of the Talpa Entities comprising the Talpa Enterprise and all properties the Individual Defendants purchased with their ill-gotten gains, including without limitation 2411 Lockerly Pass.

624.   The Plaintiffs have no adequate remedy at law.

### COUNT XV: IMPOSITION OF EQUITABLE LIEN
### O.C.G.A. § 23-2-90 and Common Law
### Against All Defendants

625.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

626. An equitable lien on specific property may be decreed whenever, under the rules of equity, the circumstances require this remedy.

627. The Plaintiffs seek and are entitled to the imposition of an equitable lien against all accounts, property, and tangible and intangible assets owned by all of the Talpa Entities comprising the Talpa Enterprise, because the funds and assets between the disparate Talpa Entities have been commingled to such a decree that Plaintiffs do not have an adequate remedy at law. Plaintiffs also seek and are entitled to the imposition of an equitable lien against all assets of the Individual Defendants that can be traced back to profits that were stolen from the Plaintiffs.

628. Plaintiffs' remedies at law are inadequate because the Individual Defendants have been siphoning profits from the Talpa Entities and rolling those funds into personal and business real estate assets that Plaintiffs do not have legal title over, as set forth above.

## COUNT XVI: RECEIVERSHIP
### O.C.G.A. §§ 9-8-1 and 14-2-1432
### Against All Talpa Entities

629. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

630.   Because of the Individual Defendants' long history of concealing profitability, hiding assets, misappropriating profits, overpaying the Individual Defendants, commingling funds between disparate Talpa Entities, paying attorneys to aid them in their efforts to deprive the Plaintiffs of their rights, selling and transferring property without the Plaintiffs' knowledge or consent, secretly applying for loans and encumbering assets, defrauding banks and various governmental entities, secretly selling and transferring equity interests in various Talpa Entities, refusing to even request the Plaintiffs' consent to major transactions, hiding assets, and orchestrating the Freeze-Out and the Squeeze-Out, the Individual Defendants have demonstrated that they will continue to engage in unlawful activity in violation of the Plaintiffs' rights unless prevented from doing so.

631.   If left in control of the Talpa Enterprise to the exclusion of the Plaintiffs and without Court supervision, the Individual Defendants will continue to engage in racketeering and misappropriate funds rightfully due to the Plaintiffs to the great prejudice of the Plaintiffs.

632.   Without the appointment of a receiver over all of the Talpa Entities, the Individual Defendants would be free to transfer and dispose of assets, which

could render the Talpa Entities from which the Plaintiffs are entitled to recover insolvent by the time of a verdict in this case.

633.   Without the appointment of a receiver, the Plaintiffs' rights cannot be fully protected.

634.   Equity requires the appointment of a receiver to take possession of the Talpa Entities because the danger of destruction and loss requires such interference.

635.   Absent the appointment of a receiver, Plaintiffs' property may be lost entirely. Accordingly, the Plaintiffs are entitled to appointment of a receiver over the Talpa Entities to ensure that assets are preserved.

## COUNT XVII: UNJUST ENRICHMENT
## O.C.G.A. §§ 9-3-26 and 10-1-763
### Against All Defendants

636.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

637.   Plaintiffs have contributed time, money, and property as sweat equity into the Talpa Enterprise, including without limitation the following:

a. Plaintiff Hilario's under- or un-compensated efforts in launching and growing the Talpa #2 Store, spearheading marketing efforts for the Talpa #5 Store, and screening potential employees for the Talpa Enterprise; and

b. Plaintiff Nicolas' buildout of the Talpa #3 Store, completing construction of the Talpa #5 Shopping Center and the Talpa #5 Store, providing material and labor to paint the Talpa #7 Store and the Talpa #12 Store, providing materials to the Talpa #12 Store, and making mortgage payments for N&G Management out of his personal funds.

638. The labor and materials provided by Plaintiff Hilario and Plaintiff Nicolas conferred benefit upon the entire Talpa Enterprise.

639. In addition, the Plaintiffs were further damaged, and a benefit has been conferred upon the Defendants by virtue of (without limitation) the Plaintiffs paying taxes on profits they never received (because those profits were misappropriated by the Defendants).

640. Plaintiff Hilario further conferred a benefit upon the Talpa Enterprise by using his personal credit to purchase vehicles and taking on personal liability with respect to the Trucking Company.

641. It would be unjust and inequitable to allow the Defendants to retain the benefits conferred, because Plaintiffs contributed their time, money, and property with the expectation that they would be treated fairly and not frozen out of the company that they were instrumental in helping to build.

642.   The Plaintiffs have been damaged by the Defendants' actions in an amount to be proven at trial.

## COUNT XVIII: PUNITIVE DAMAGES
### Federal and State Statutes and Common Law
### Against All Defendants

643.   The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

644.   The Defendants have acted willfully, maliciously, recklessly, and with extreme disregard for the consequences of their actions and the damages caused thereby to the Plaintiffs.

645.   Both Federal and Georgia law provide for an award of punitive damages when a defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

646.   Punitive damage are available under both Federal and State RICO statutes.

647.   The Defendants have acted with malice and oppression by committing racketeering, converting the Plaintiffs' property, defrauding the Plaintiffs, breaching fiduciary duties to the Plaintiffs, and conspiring to do the foregoing.

648.   The Defendants have shown an entire want of care for how their actions would negatively impact the Plaintiffs, viewing the Plaintiffs as expendable buckets

of money, credit, and labor for their own gains, a wantonness demonstrated by the shell companies, falsified corporate records, misuse of personal identity documents and credit, and threats to "take everything" from Plaintiffs when asked about their inexplicable actions.

649. The Defendants have acted with the specific intent to commit the foregoing acts, and those actions have caused significant damages to Plaintiffs, in an amount to be proven at trial.

650. Punitive damages in an amount to be proven at trial should be imposed against the Defendants to deter them from further willful and intentional harm to the Plaintiffs and others impacted by their dealings.

## COUNT XIV: ATTORNEYS' FEES AND LITIGATION COSTS
### Federal and State Statutes and Common Law
### Against All Defendants

651. The Plaintiffs restate and incorporate by reference the forgoing paragraphs of this Complaint, as though the same were fully set forth herein.

652. The Defendants have been stubbornly litigious, caused the Plaintiffs unnecessary time and expense, and have acted in bad faith in their dealings with the Plaintiffs.

653. The Plaintiffs, as a direct result of the Defendants' conduct, have been forced to retain legal counsel and are entitled to recover their attorney's fees and

expenses for having to pursue this action against Defendants pursuant to O.C.G.A. § 13-6-11.

654. The Defendants have no justification for their actions.

**WHEREFORE,** Plaintiff Hilario and Plaintiff Nicolas, both together and separately, pray for the following relief against all named Defendants as follows:

a. That this Court liberally construe the Federal and Georgia RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise under both Federal and State law that consists of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce.

b. That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO enterprise through a pattern of racketeering activity in violation of both Federal and State RICO laws.

c. That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or

conspired to acquire and maintain control of, a RICO enterprise engaged in a pattern of racketeering activity in violation of Federal and State laws.

d.  That all Defendants, and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

e.  That all Defendants, and their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from committing any more predicate acts in furtherance of the RICO enterprise.

f.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering activity in violation of applicable Federal and State laws.

g. That judgment be entered for Plaintiffs and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of the Federal and State RICO laws.

h. That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. § 1964(c) and O.C.G.A. § 16-14-6, and all relevant case law, for any gains, profits, or advantages attributable to all violations of the Federal and State RICO statutes.

i. That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of Federal and State RICO laws.

j. That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable attorney's fees, at a minimum of $425 per hour worked.

k. That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation applicable Federal and State RICO laws, be deemed to be held in constructive trust for the benefit of Plaintiffs, their heirs and assigns.

l.  That the Court enter a declaratory judgment declaring that the Talpa Entities are alter egos of one another and that the Plaintiffs have equitable interests in the entire Talpa Enterprise;

m.  That enter a declaratory judgment regarding the Plaintiffs' rights under various operating agreements and shareholder agreements;

n.  That the Plaintiffs recover an award of compensatory damages in the amount of damages sustained because of the Defendants' fraud, conversion, breach of fiduciary duties, and related conspiracies;

o.  That the Defendants be enjoined from distributing any profits to any equity holder in any of the Talpa Entities, paying any overtime, bonuses, or other compensation in excess of a reasonable salary to any of the Individual Defendants or any of their relatives, using any funds of any of the Talpa Entities to pay any attorneys for representation any of the Individual Defendants, selling or transferring any property outside the ordinary course of business (or their ordinary household affairs), submitting any applications for any loan to any financial institution on behalf of any of the Talpa Entities, pledging any assets or equity of any of the Talpa Entities as collateral to any party, selling or transferring any equity interest in any Talpa Entity, taking any action with respect to any of the Plaintiff-Owned Entities outside the

ordinary course of business without the consent of the Plaintiffs, refusing to produce books and records of the Talpa Entities, or transferring any funds out of the United States until the Plaintiffs are compensated in full.

p.  That the Court impose an equitable lien on all assets of all of the Talpa Enterprise and all assets of the Individual Defendants traceable to funds to which were the lawful property of the Plaintiffs;

q.  For the appointment of a receiver over the affairs of the Talpa Enterprise;

r.  That the Plaintiffs recover an award of compensatory damages to the extent that the Defendants were unjustly enriched;

s.  That Plaintiffs have judgment against Defendants on all counts of the Complaint;

t.  That punitive damages be assessed and levied against Defendants;

u.  That Plaintiffs recover their reasonable attorney's fees, court costs, and other litigation expenses associated with the instant action under any available Federal or State statute or other theory of recovery;

v.  That Plaintiffs recover an award of compensatory damages in the amount of damages sustained as a result of the Defendants' fraud, conversion, breach of fiduciary duties;

w.  For the appointment of a receiver over the affairs of the Talpa Enterprise;

x.  For trial by jury; and

y.  For such other and further relief as this Court deems just.

Respectfully submitted this 23rd day of October, 2022.

**HUDSON LEGAL, LLC DBA**
**SAGE BUSINESS COUNSEL**

*/s/ Danielle Hudson Laughlin*
Danielle Hudson Laughlin
(GA Bar No. 651990)
11695 Johns Creek Parkway, Suite 130
Johns Creek, GA 30097
Tel: (678) 825-4525
E: danielle@sagebusinesscounsel.com
*Counsel for Plaintiff Hilario*

**-and-**

**KECK LEGAL, LLC**

*/s/ with express permission*
Benjamin R. Keck
(GA Bar No. 943504)
2566 Shallowford Road, Suite 104-252
Atlanta, GA 30345
Tel: (678) 641-1720
Email: bkeck@kecklegal.com
*Counsel for Plaintiff Nicolas*

**-and-**

**LAW OFFICES OF MATTHEW K. WINCHESTER**

*/s/ with express permission*
Matthew K. Winchester
(GA Bar No. 399094)
3151 Maple Drive, Garland Law Building
Atlanta, GA 30305
Tel: (678) 517-6894
E-mail: K.winchestercb@gmail.com
*Counsel for the Delgado Plaintiffs*